Perret v. New Orleans Times Newspaper.

No. 2806.

L. CHARLES PERRET *v.* NEW ORLEANS TIMES NEWSPAPER.

The publication of any communication with or without the name of the author, which is defamatory and false, subjects the publisher as well as the author to damages in favor of the party aggrieved.

The law looks to the *animus* of the publisher in permitting his columns to be used as a vehicle for the dissemination of calumny. In such a case, it is not incumbent upon the party assailed by defamation to show malice against himself on the part of the publisher, nor to prove that he has received injury by the publication. If the charges are false, the law implies malice in the publisher—not a malice which means a spite against the individual, but *malus animus*—a wanton disposition grossly negligent of the rights of others; and the injury inflicted is not repaired by the subsequent retraction or apology of the publisher, however promptly it may be made.

The proprietor of a newspaper is not exonerated from responsibility, because the libelous matter appearing in his paper was inserted without his knowledge, or approbation, or even against his wishes. He is responsible for the acts of his agents and employes.

It is not sufficient for his exoneration that the printer, by naming the author, gives the party aggrieved an action against him.

A reparation by recantation can only be considered in estimating the amount of damages.

In an action of libel it is not necessary to prove any special damage to recover.

By the statute of 1855, Revised Statutes p. 706, sections 3640 and 3641, the truth of libelous matter may be pleaded in justification, and if it shall appear that the matter charged as libelous is true and was published with good motives and for justifiable ends, the party shall be acquitted.

APPEAL from the Sixth District Court, parish of Orleans. *Cooley, J.* Jury trial. *Labatt & Aroni,* for plaintiff and appellant. *Alexander Walker, J. Lingan* and *Garrett Walker,* for defendant and appellee.

Justices concurring: Ludeling, Taliaferro, Howell, Morgan.

TALIAFERRO, J. This is an action of slander. The plaintiff alleges that the defendant is liable to him in damages to the amount of ten thousand dollars, for the publication of a card signed by some unknown and irresponsible persons whose residence is unknown and whose names are fictitious, containing false, malicious and libelous charges against him by which he has been greatly injured and damaged in the estimation of his friends and the public. The card complained of is couched in these words:

"NEW ORLEANS, February 19, 1869.

."We, the undersigned, most respectfully lay before the public the following very astonishing facts that took place last night near the Carrollton depot: While we were on our way home from Carrollton to New Orleans, three police officers of the above place assailed us with revolvers pointed to us, to deliver every cent we had about us. All the money that we had was five dollars, and on delivering the same they left off. What sounds more horrible is that these so called officers were accompanied by his honor Judge Perret, judge of Carrollton and Canal avenue.

" Signed,                    JOHN BRIANT,
                             D. L. THOMPSON,
                             W.. B. SAVORY,
                             H. B. DELORD,
                             JAMES B. RUBB,
                             No. 413 Frenchman street."

The answer is a general denial. The defendant admits that the instrument so signed was published, as charged by plaintiff, but says it was published as an advertisement; that it was received by one of the employes of the establishment at a late hour of the night, and during the absence and without the knowledge of the proprietors of the newspaper. He specially denies that the said advertisement contains any libelous or slanderous charges or imputations that could endamage plaintiff, and he specially denies that such publication was made with any malicious intent on the part of the respondent.

The case was tried before a jury which rendered a verdict in favor of the defendant.

The plaintiff has appealed.

A bill of exceptions, taken by the plaintiff to the charge given to the jury by the judge on the trial of the case below, presents for our consideration several important questions arising in this case. The plaintiff insists that the judge erred in expounding to the jury the law relating to the publication of libels, and thereby misled the jury and caused their verdict to be rendered for the defendant.

These portions of the charge more especially excepted to are in the following words: "But this malice, whether express or implied, may be refuted, and it devolves upon the defendant to produce such proof. It is competent for him, as going to show the want of malice, to prove that the article was published without his knowledge; that it came to the paper through the ordinary channels of public news; that the parties from whom it was received were men about whose credibility there existed at the time no reasonable suspicion. These remarks apply to the liability of proprietors of newspapers for publishing libelous articles, either as editorials or as anonymous communications, but I take it sound reason and justice require that the rule of responsibility should be different when the publication complained of is not an editorial nor an anonymous communication, but on the contrary contains the name and residence of the writer. In this last case the same degree of liability can not with propriety be exacted from the proprietor of a newspaper. If the same responsibility were enforced in both cases it would, in my judgment, amount to a complete stoppage to all such publishing enterprises, and I believe it to be the true spirit of our institutions rather to encourage than prevent their existence. I consider the true rule to be that malice will be presumed in relation to publications which are proven to be defamatory and false, whether these publications are either editorials or anonymous communications, but there exists no such legal presumption of malice when the publication is one in the nature of an advertisement, the verity of which is vouched for by the signature and residence of the party asking its publication. In such a case, many of the reasons

which vindicate the rules presuming malice in the other exists, and it would be senseless to apply rules when the reasons for their existence have ceased. Therefore you will decide as to the proper character of the publication complained of, whether it is an editorial or an anonymous communication; you will then consider whether the averments thereof have been proved to be defamatory and false. If you are satisfied that it is an editorial or an anonymous communication and that its averments are defamatory and false, then you may infer that it was maliciously published, and you will give a verdict in favor of the plaintiff for such damages as in your opinion will compensate the wrong committed, and serve as a punishment to the defendant for his offense.

"In this case you may take into consideration whether the publication was made with the knowledge of the defendant, and if by his servants, whether in so doing they were acting within the scope of the duties confided to them to serve as guides in the discharge of those duties. The defendant can not be held responsible for vindictive damages if it be shown that the same was made by his employes against his wishes, and in violation of his express orders. If, on the contrary, you conclude that the publication was merely an advertisement, then you can not infer malice on the part of the defendant, simply from the fact that the advertisement is both defamatory and false. In the case of an advertisement signed by parties who gave their residence, it is the duty of the plaintiff to prove malice, and unless he does he can not recover damages. The distinction between an editorial and an advertisement constitutes the reason for the difference of liability in the two cases. In the first the charge, if defamatory and false, comes from the proprietor himself; he vouches upon his own responsibility for the truth of the publication, and should be held strictly accountable if the publication turn out to be false and defamatory. But in the case of an advertisement bearing the signature and residence of the party who wishes its publication, the proprietor can not be said to vouch for the truth of the averments or charges in the publication. Nobody in the community would believe the charge to be true, because they knew the proprietor of the paper to be a responsible man; in such a case the public would look to the character of the author of the publication to believe or disbelieve the charge. If the parties signing the advertisement are shown to be men who were known to the proprietor of the paper, and known by him to be entitled to no credit, or if the circumstances existing at the time were such that an ordinary prudent man ought to have made inquiries, then the proprietor could not claim the benefit of being presumed without malice. But if the circumstances under which the advertisement was inserted were the usual ones in such cases, and that there

was nothing in existence at the time to excite the suspicion of a pru-
dent man, then the publication is free from the presumption of malice
however defamatory and false it may have been. No damages can be
awarded by you unless the plaintiff has shown malice outside of the
publication itself."

We think the instruction given to the jury erroneous in several
important particulars, and therefore that the exception was well taken.

We regard the doctrine as no longer controverted that the publica-
tion of any communication, with or without the name of the author,
which is defamatory and false, subjects the publisher as well as the
author to damages in favor of the party aggrieved. Circumstances
may be shown in mitigation of damages. The law looks to the
*animus* of the publisher in permitting his columns to be used as a
vehicle for the dissemination of calumny, whereby the fair character
of an individual may be blasted and his business pursuits ruined.
In such a case it is not incumbent upon the party assailed by falsehood
and defamation to show malice against himself on the part of the pub-
lisher, nor to prove that he has received injury by the publication.
The law implies malice in the publisher from the act of publishing the
libel; not malice in the sense of spite, antipathy or hatred towards the
party assailed, but the evil disposition, the *malus animus* which induced
him wantonly, recklessly or negligently, in disregard of the rights of
others, to aid the slanderer in his work of defamation by the potent
enginery of the public press, written or printed slander being justly
considered more pernicious than that uttered by words only. Neither
does the law regard the injury inflicted as being repaired by the sub-
sequent retraction or apology of the publisher, however promptly it
may be made, for it is quite reasonable to infer that many may have
read the libel who never saw or heard of its disavowal. Nor is the
proprietor of a newspaper exonerated from responsibility because the
libelous matter appearing in his paper was inserted without his
knowledge or approbation, or even against his wishes. He is respon-
sible in damages for the acts of his agents and employes. To the
party affected by the slander the injury is the same, whether the pub-
lication was made with or without the consent of the proprietor. The
agent or employe may be an irresponsible person.

In the case of Dole *v.* Lyon, 10 Johnson's Reports, Chancellor Kent
said: "Individual character must be protected, or social happiness
and domestic peace are destroyed. It is not sufficient that the printer
by naming the author gives the party grieved an action against him.
This reason of the rule is mentioned in Lord Northhampton's case, and
repeated by Lord Kenyon. But this remedy may afford no consolation
and no relief to the injured party. The author may be some vagrant
individual who may easily elude process, and if found he may be

without property to remunerate in damages. It would be no check on a libelous printer who can spread the calumny with ease and with rapidity throughout the community. The calumny of the author would fa'l harmless to the ground without the aid of the printer. The injury is inflicted by the press which, like other powerful engines, is mighty for mischief as well as for good."

In the case of Huff v. Bennett, 4 Sandford's Reports 130, it was urged on the part of the defendant, admitted to be the publisher of the Herald, who was sued for the publication of several alleged libels, that there was no evidence that he had actual personal knowledge of the publication of the article in question. The court said: "This was an immaterial point. The defendant as the proprietor of the paper was responsible for whatever appeared in its columns, and it was unnecessary to show that he knew of the publication or authorized it. This point is well established."

"In an action for a libel against the printer of a newspaper, it is not a justification that the publication was made at the instance of a person whose name was given at the time, and who paid for it in the usual course of business, though it may go in mitigation of damages." 2 Starkie 471, note; 3 Yeates 518; 3 Wash. 246; 1 Bouney 90; 3 An. 69.

The case of Tresca v. Maddox, 11 An. 206, was an action against the proprietor of a newspaper for damages for a libel. One of the employes of the defendant, at that time the proprietor of the Crescent newspaper, and, as it seems, without the knowledge of the proprietor, published an exaggerated and inflammatory article, in which the plaintiff was called a pirate. The answer admitted that the charge was false—that defendant had been misled by certain police reports—that instantly on discovery of the error, he had retracted it publicly in his newspaper, with which plaintiff had expressed himself satisfied. The defendant denied that there was malice in the act of publishing the statement. The jury awarded a verdict in favor of the plaintiff for $1000 damages, which was affirmed on appeal. This court said in that case: "No express malice was proved. Indeed it may be assumed that the defendant, when he made the publication, did not know who Captain Tresca was, and therefore could have had no special malice against him. But in actions of this character malice is often implied. At common law, if the words spoken or published are actionable (as if they import an accusation of an indictable offense), malicious intent is an inference of law, and therefore needs no proof. 2 Greenleaf Ev. section 418 (4). In this case malice does not mean a spite against the individual, but *malus animus*, a wanton disposition, grossly negligent of the rights of others. We think the jury might properly have inferred such malice under the circumstances of the case. 3 La. 208.

The reparation made by recanting the charges the day after they were made was proper to be considered by the jury in estimating the amount of damages; but could not, as the appellant contends, exonerate him entirely. The injury had been done. *Vox semel emissa nunquam revertit.* The slander circulated by one issue of the paper, could not be wholly obliterated by the recantation in another. All who saw the first may not have seen the last. And it is difficult wholly to restore a reputation thus positively and publicly accused of the highest crimes known to the law." It is urged that the plaintiff is debarred from a recovery by the expression of his satisfaction at the apology and retraction published by the defendant. A bargain of this kind could be enforced under our law as it is competent for the injured party to release his claim for damages. But it must appear that he has released it, or expressly agreed to waive his action for the consideration named."

In regard to malice, the rule is, that it need not be expressly proved but will be implied if the charge be false. "Malice is an imputation of law from the false and injurious nature of the charge, and differs from actual malice or ill will towards the individual, frequently given in evidence to enhance the damages." 4 Wendell.

On the question of damages recoverable in cases of libel, the doctrine is well settled that: "Actions of slander may be maintained without proving damages, and the party may recover. This doctrine was recognized by this court after a very full argument in the well considered case of Miller *v.* Holstein, 16 L R. 389. It was there determined that the courts of Louisiana are not bound by the technical and artificial rules of the common law in slander, but where our law is silent we may resort to a foreign system for a rule consonant to reason and equity. In that case it was announced that the court was not prepared to adopt the common law distinction between words actionable in themselves and words which are not so, and to say a plaintiff is not entitled to recover in an action of slander unless charged with an indictable offense, without proof of special damages." And accordingly it sustained that part of the charge given to the jury in that case which instructed them that "the [slanderous] words were to be understood in their common and popular meaning, and if they charged the plaintiff falsely and maliciously with moral turpitude, so as to injure his character and standing in society, they might find for the plaintiff, without showing any special damage."

"In an action of libel, proof of damages from the publication is not necessary to recover. The actual pecuniary damage in such actions can rarely be proved, and is never the sole rule of assessment." 3 An. 69; 11 An. 206.

"In actions of slander plaintiff may recover, though he show no

special damage. The jury have no fixed rule in assessing damages, and may take into consideration the trouble incurred in seeking relief." 14 La. 198. See 15 An. 166 and 3 La. 207; 2 Rob. 365; 5 Rob. 116 and 8 Rob. 51.

By a statute of this State, enacted in 1855, the truth of the slanderous, defamatory or libelous words or matter, for the uttering or publishing of which a party is sued, may be pleaded in justification; and if it shall appear that the matter charged as libelous is true and was published with good motives and for justifiable ends, the party shall be acquitted. Revised Statutes 706, sections 3640 and 3641.

We shall now proceed to inquire how far these principles and rules of the law of libel, collated from various authorities are applicable to the facts presented in this case. About nine o'clock at night three or four men came into the defendant's office much excited, and one of them, at least, in a state of intoxication. They complained of an outrage which they said had been committed against them at Carrollton, and wanted to publish a card in relation to it. They showed the card to the managing editor, who advised them not to publish it. They replied that if the card had been brought in by wealthy people, better dressed than they were, there would have been no objection; but, because they appeared to be poor men their card was refused. The editor finally directed the employe having charge of the advertising department to receive their card, and take their names and residences. The spokesman of the party was under the influence of liquor. The advertising editor proposed to alter the phraseology of the card, which he considered ridiculous, but this was vehemently objected to by the parties, who displayed a dictatorial manner, demanding the insertion of the card as it was presented, and this was finally assented to. These men were entire strangers to the employes of the office, were coarse in their manners, and they demanded peremptorily the publication of an article couched in language indicating that their ignorance was in keeping with their effrontery. The next morning, soon after the article appeared in the paper, the plaintiff went to the defendant's office to complain of the publication. The proprietor of the paper had known nothing of the matter. In conjunction with the plaintiff he used active measures to find the parties who had caused the publication to be made; but after strict search through the aid of police officers, not one of them was ever found. Every thing in relation to them appeared fictitious and mythical. One of them signed the card giving his residence No. 413 Frenchmen street. The numbering on the houses in Frenchmen street, it was found did not run as high as 413, and there was no tenement of any kind in that street having that number. Suit was instituted by the plaintiff against all the parties and by the returns of the sheriff it appeared they were not to be found

after due and diligent search and inquiry had been made. It turned out that late in the day, previous and a few hours before they appeared in the defendant's office to demand the publication of their card, they had been arrested in Carrollton for disorderly conduct, and taken before the plaintiff, a justice of the peace, who had imposed upon one of them a fine of five dollars.

The defendant avers in his answer that when complaint was made to him by the plaintiff, that the advertisement was false and injurious to him, he caused to be inserted in an editorial article in the "Times" newspaper an explanation, which the plaintiff accepted as satisfactory, and in vindication of himself. This editorial is in these words: "An advertisement appeared in the Times yesterday in which Judge Perret, of Jefferson, and the police officers of Carrollton, are charged with certain very improper conduct toward five persons, whose names were attached to the advestisement. We are assured by Judge Perret that there is not a word of truth in this card—that he and the police officers of Carrollton were engaged in the performance of their duties in preserving peace and order in the cars, where the advertisers were creating a disturbance, and violating the ordinances of the city and the laws of the State. If Judge Perret's statements are correct, the advertisers in question have assumed a responsibility by their publication which they have no right to expect us to share with them."

The plaintiff, by the publication in question, is charged with complicity in the commission of a high crime. The terms used admit of no other construction. This charge is shown to be false and defamatory. Malice is, therefore, implied as arising from the needless and reckless publication of the advertisement, in wanton disregard of the rights of others. The facts certainly show the culpable want of a prudent respect for the character and feelings of others which should be shielded from falsehood and defamation. On the first presentation of the libelous card, the managing editor, as he states himself, advised the parties not to have it published. This clearly shows that he saw the impropriety of its publication, and yet he yielded to the importunities of those men, and permitted its insertion, an act which his first impression and better judgment did not approve. In the defense of this case much has been said of the liberty of the press, and of the right of persons to make known to the public their wrongs and grievances, and it is asserted as a duty to publish pleas addressed to public opinion, asking that justice be rendered, and a wrong like that complained of by the parties, who presented their card to the defendant, be condemned by the popular censure and disfavor. The press is set up as a tribunal for the redress of wrongs. The liberty of the press, we concede, is the palladium of civil liberty. It is one of the essentials of a free government. It is a sacred right secured by our organic

12

law; but with the grant of the right is imposed the obligation to re-
frain from its abuse.  Public journalists, like everybody else, are held
to an observance of the proprieties of social life.  While the utmost
latitude is accorded to them in the discussion of all subjects, and they
may freely comment upon the acts and conduct of men as individuals,
to say nothing of the wide expanse of authority to speak faithfully
and boldly in the interests of the people regarding public measures
and questions of all kinds that concern the community at large, still
there is a limit beyond which this freedom becomes license.  It is
upon the confines of these that responsibility begins.  The law which
shields the private character and reputation of an inoffensive person
from the assaults of calumny and falsehood, is founded upon a public
sentiment of greater power even than that of the free press.  It for-
bids the wanton violation of the sacredness of personal character and
good name.  In this case no public need required the publication of
the offensive card.  No public interest was subserved by it.  No pri-
vate wrong was redressed by it, and no good reason existed to suppose
there would be.  But as the result shows, a wrong was inflicted.  A
man of respectable character and good report in the community, was
falsely charged with the crime of robbery; and the charge went forth
to the world in the columns of a newspaper having an extensive cir-
culation.

The defendant alleges that no injury could result to the plaintiff by
the publication complained of, and sets up reparation made by the
editorial article he caused to be inserted in the Times, and which he
avers the plaintiff accepted as a satisfactory explanation.  The plain-
tiff may have been damaged in character and standing in society, and
yet be unable to establish it by proof.  But we have seen from the
authorities already referred to that in actions of libel proof of damages
is not necessary to enable the party to recover.  3 An. 69, 11 An. 206.
The allegation that the plaintiff accepted the editorial article as satis-
faction is not sustained by the evidence.  The terms of the article do
not import an acknowledgment of the falsity of the charge made in
the card against the plaintiff.  On the contrary they are vague and
hypothetical.  But the defendant relies principally upon the position
that having, at the time the publication was made, reason to believe
the statement of the parties signing the card was true, no malice can
be inferred against him, and he relies upon the case of Bodnell v.
Osgood, 3 Pickering's Reports, 384, where it is laid down that "the
deliberate publication of a calumny when the publisher knows it to be
false, or has no reason to believe it to be true, is conclusive evidence of
malice."

We have already shown that in a case like the one at bar, the malice
implied where the charge is false is not malice in the sense of hatred

or spite towards an individual. It is the act of publishing to the world matter which is false and defamatory. It is the doing of this act with utter disregard to the effect it may have upon the rights, the character, the feelings and the interests of the individual traduced. Conduct of that kind is reprehensible in morals and is held culpable in law. The belief at the time of publishing the falsehood that it was true can only go according to circumstances in mitigation of the offense, and not to exculpate the party. Upon the defendant's doctrine even, we should, in view of all the facts shown in this case, hesitate to conclude that he had good reason to believe the charge against the plaintiff to be true.

This case bears a close resemblance in most respects to that of Tresca v. Maddox, 11 An. 206, which we have adverted to. The case now before us, however, is a stronger one against the defendant.

The evidence in the record is full and clear and enables us to do justice between the parties. We are satisfied from a careful consideration of all the facts that the plaintiff has made out a case which entitles him to damages, and we think the amount should be fixed at five thousand dollars.

It is therefore ordered, adjudged and decreed that the judgment of the district court be annulled, avoided and reversed. It is further ordered that the plaintiff, L. Charles Perret, recover from Charles A. Weed, proprietor of the newspaper styled "The New Orleans Times," the sum of five thousand dollars, with interest thereon at five per centum per annum from judicial demand, and all costs of suit.

Justice Wyly being absent took no part in this decision.