23536

Sandra Prosser HOLTZSCHEITER, Appellant v. THOMSON NEWSPA-PERS, INC., d/b/a The Florence Morning News, and Dr. Kay Mitchell, Respondents.

(411 S.E. (2d) 664)

Supreme Court

*John S. DeBerry,* Florence, *for appellant.*

*E.N. Zeigler,* Florence, and *J. Edward Bell,* Sumter, *for respondents.*

Heard Jan. 23, 1990; Decided Dec. 16, 1991.

Reh. Den. Jan. 7, 1992.

CHANDLER, Justice:

Sandra Prosser Holtzscheiter (Holtzscheiter) appeals an Order granting Respondent, Florence Morning News (Newspaper), directed verdicts on causes of action for defamation and intentional infliction of emotional distress.

We affirm in part, reverse in part and remand.

## FACTS

On July 26, 1986, Newspaper reported the murder of Holtzscheiter's 17-year-old daughter, Shannon. The news article contained background information that Shannon was "a drifter," "the product of a broken home," was not "the image of sweet-sixteen, definitely not a cheerleading type," was "in with the wrong crowd," and, lastly, characterized Shannon as a high-school drop-out who had "no family support to encourage her to continue her education."

Holtzscheiter instituted this defamation suit alleging that the words "there simply was no family support to encourage her to continue her education" implied that she was an unfit mother and, as such, had contributed to Shannon's death. The complaint also alleged intentional infliction of emotional distress.

At trial, Holtzscheiter presented several witnesses who testified she was a good mother who encouraged her children to continue their education. Additionally, testimony indicated that Holtzscheiter's reputation was injured by the article as "it was the talk of the town, the whole neighborhood.... They didn't think anything of the family, by what they had read in the paper."

The Court, ruling that interpretation given the article by "someone else" was irrelevant, limited this line of testimony.

At the close of evidence, the Court granted Newspaper's motion for directed verdict in the defamation action, holding

that Holtzscheiter had failed to prove special damages as required in cases of libel *per quod*. The Court also ruled Newspaper's conduct did not "exceed all possible bounds of decency" and, accordingly, directed a verdict in the action for intentional infliction of emotional distress.

## ISSUES

Holtzscheiter contends the trial Court erred:

1. In directing a verdict in the defamation action.
2. In directing a verdict in the intentional infliction of emotional distress action.
3. In limiting testimony regarding how "someone else" interpreted the news article.

## DISCUSSION

### I. DEFAMATION

In determining if proof of special damage[1] is necessary to make a libel actionable, we are guided by our leading case on the subject, *Capps v. Watts*, 271 S.C. 276, 246 S.E. (2d) 606 (1978).

Under *Capps*, it must first be determined whether the words published by the defendant are capable of a libelous meaning. *Id.* at 281-82, 246 S.E. (2d) at 609. Either the publication must be libelous on its face (libel *per se*),[2] or the defendant's words must derive a defamatory meaning from extrinsic facts (libel *per quod*).[3]

Next, it must be determined whether damages, general or special, have resulted to the plaintiff, in the form of general or special damages. Special damage is required for some, but not all, cases of libel. *Capps* at 283-86, 246 S.E. (2d) at 610-12. *Per se* libels are actionable without proof of special damage, *id.* at 284-85 n. 2, 246 S.E. (2d) at 611 n. 2, as are certain categories of libel *per quod, id.* at 286, 246

---

[1] Special damage is economic loss to the plaintiff resulting from injury to her reputation. Hubbard & Felix, *The South Carolina Law of Torts*, 401-2 (1990).

[2] *See also Whitaker v. Sherbrook Distrib. Co.*, 189 S.C. 243, 200 S.E. 848 (1939).

[3] *See also Brown v. National Home Ins. Co.*, 239 S.C. 488, 123 S.E. (2d) 850 (1962).

S.E. (2d) at 611-12. The applicable rules are summarized in Prosser, *The Law of Torts* § 112, p. 763 (4th ed. 1971), cited with approval in *Capps:*

> The great majority, of some thirty-five other courts, have agreed [that proof of special damage is unnecessary] where the publication is defamatory upon its face. They have disagreed, however, where extrinsic facts are necessary to make out the defamatory meaning conveyed; and they have held that such libel 'per quod' is to be treated like slander. If the imputation falls into one of the four special slander categories, it is actionable without proof of special damage. If it does not, there can be no recovery unless special damages is pleaded and proved. (Footnotes omitted).

Applying the *Capps* analysis here, we hold that proof of special damage was unnecessary. Although ambiguous, the newspaper article could be read, on its face, to charge Holtzscheiter with failing to support her daughter by not encouraging her to continue her education. If untrue, this would constitute a libel *per se*, for which special damage is not required. The trial court, therefore, erred in refusing to submit defamation to the jury.[4]

---

[4] The dissent contends that "the record is replete with evidence that the victim was in fact without family support."

In ruling on a directed verdict motion, the trial court must view the evidence and all reasonable inferences in the light most favorable to the non-moving party. *Santee Portland Cement v. Daniel International Corp.*, 299 S.C. 269, 384 S.E. (2d) 693 (1989). "We are not at liberty to pass upon the veracity of the witnesses and determine the case according to what *we* think is the weight of the evidence." *Graham v. Whitaker*, 282 S.C. 393, 398, 321 S.E. (2d) 40, 43 (1984). [Emphasis supplied].

Here, in addition to Holtzscheiter's testimony regarding her efforts to re-enroll Shannon in school (Tr. p. 367, 314), there was testimony that she "was always telling the children . . . to go to school and get a good education" (Tr. p. 342) and that "she always expressed her wish that her children get educated. . . . She has taken whatever steps she thought was appropriate . . . to ensure her kids were educated." (Tr. p. 401).

The dissent, in substituting its own view of the evidence, contravenes our established standard for appellate review.

Holtzscheiter clearly presented sufficient testimony to withstand a directed verdict motion.

## II. INTENTIONAL INFLICTION
## OF EMOTIONAL DISTRESS

The tort of "intentional infliction of emotional distress" or "outrage" was first recognized in *Ford v. Hutson*, 276 S.C. 157, 276 S.E. (2d) 776 (1981). There, we held that a plaintiff must establish:

> (1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from his conduct, *Restatement (Second) of Torts § 46, Comment i;* (2) the conduct was so 'extreme and outrageous' as to exceed 'all possible bounds of decency' and must be regarded as 'atrocious, and utterly intolerable in a civilized community,' *Restatement (Second) of Torts § 46, Comment d;* (3) the actions of the defendant caused the plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was 'severe' so that 'no reasonable man could be expected to endure it.'

276 S.C. at 162, 276 S.E. (2d) at 778.

Initially, "it is for the Court's determination whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, and only where reasonable persons might differ is the question one for the jury." *Todd v. South Carolina Farm Bureau Mutual Ins.*, 283 S.C. 155, 167, 321 S.E. (2d) 602, 609 (Ct. App. 1984), *reversed in part on other grounds*, 287 S.C. 190, 336 S.E. (2d) 472 (1985).

We agree with the trial Court that the language of the article here was not so extreme and outrageous as to exceed all possible bounds of decency. Direction of verdict on this cause of action was properly granted.

## III. EFFECT OF ARTICLE
## ON READERS

The trial Court's ruling that evidence of "how someone else perceived the words was irrelevant and inadmissible" does not accord with this Court's holding in *Nettles v. MacMillan Petroleum Corp.*, 210 S.C. 200, 42 S.E. (2d) 57 (1947):

The general rule is that the testimony of readers or hearers in actions for libel or slander, as to what they understood the alleged defamatory words to mean, is inadmissible, at least where the words are unambiguous and plain and in the absence of peculiar circumstances, either as respects the language employed or the manner of its utterance or publication. *However*, such evidence is held to be admissible where the meaning of the words is doubtful or ambiguous. . . . *Where the meaning of the words is doubtful or ambiguous, witnesses who heard them may be examined as to the sense in which they understood them*, but it is the province of the jury to construe words, and to determine in what sense the speaker used them. . . . The plaintiff may give evidence of surrounding circumstances from which a defamatory meaning can be inferred; he may call witnesses to state how they understood the libel; though the jury are not bound to adopt the opinions of such witnesses. [Emphases supplied.]

210 S.C. at 204, 205, 42 S.E. (2d) at 58, 59.

Here, ambiguity in the words used entitled Holtzscheiter to offer testimony which was excluded by the trial Court.[5]

## CONCLUSION

The order directing a verdict on "outrage" is affirmed. The remainder of the judgment is reversed and remanded for a new trial.

Affirmed in part; reversed in part; and remanded.

HARWELL and FINNEY, JJ., concur.

GREGORY, C.J., and TOAL, J., dissenting in separate opinion.

TOAL, Justice (dissenting):

I respectfully dissent. The majority does not address, nor did the parties here, the potential impact of the decisions of the United States Supreme Court on this case. Furthermore, the majority opinion, in my view, does not accurately interpret South Carolina case law concerning defamation. I would

---

[5] Contrary to the dissent's assertion, this evidence would not be necessary to *supply* a defamatory meaning, but would merely explain whether readers, in fact, interpreted the article to convey a libelous meaning on its face.

affirm the trial court's granting of a directed verdict in favor of the defendant as to the defamation claim, but on a different ground than that employed by the trial judge.

## I. FIRST AMENDMENT ISSUES

A proper assessment of any defamation case in the modern era should begin with a review of the United States Supreme Court cases concerning the balancing of the interests of persons to speak freely. The cases styled *New York Times v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. (2d) 686 (1964) and *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S. Ct. 1975, 18 L. Ed. (2d) 1094 (1967) were the first of a series of pronouncements in which a deeply divided Supreme Court struggled with the proper parameters of state defamation law in light of first amendment rights. In *New York Times* and *Butts* the rule was established that a public figure plaintiff suing for defamation must prove, by clear and convincing evidence, that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth.

Neither party has advanced a view as to whether the plaintiff here could be characterized as a "public figure." A reading of the record convinces me, however, that she is not to be treated as such. The analysis should therefore move to those cases dealing with "private figure" plaintiffs.

The first case decided in this vein was the much-debated *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S. Ct. 2997, 41 L. Ed. (2d) 789 (1974). *Gertz* was a 5-4 decision with one justice concurring, yet it appears now to be firmly established precedent by virtue of the doctrine of *stare decisis*.[1] In *Gertz*, a private figure sued a magazine publisher over a matter of "public concern." Observing that private figures are "more vulnerable to injury than public officials and public figures" and that private figures are "also more deserving of recovery" than public figures, the Court held that, "so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." 418 U.S. at 346, 347, 94 S. Ct. at 3010.

---

[1] In a recent 7-2 decision, the Court appeared to cite *Gertz* as an established decision. *See Milkovich v. Lorain Journal Co.*, 497 U.S. —, 110 S. Ct. 2695, 111 L. Ed. (2d) 1 (1990).

However, the *Gertz* Court also held that if only negligence is proven by the plaintiff (and liability is not based on a showing of knowledge of falsity or reckless disregard for the truth) then "the States may not permit recovery of presumed or punitive damages." 418 U.S. at 350, 94 S. Ct. at 3011. Rather such a plaintiff could only recover proven actual injuries.[2] *Gertz* contained broad language, and was thought by many to establish a definitive rule regarding private figure plaintiffs. Alas, complexity crept into the legal landscape.[3]

In *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 105 S. Ct. 2939, 86 L. Ed. (2d) 593 (1985), Justice Powell, with Justices Rehnquist and O'Connor joining, opined that the rules established in *Gertz* applied only when the allegedly defamatory speech involved a matter of "public concern." Then Chief Justice Berger and Justice White concurred

---

[2] With regard to the meaning of "actual injury," the *Gertz* Court held, "[s]uffice it to say that actual injury is not limited to out-of-pocket loss. Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." 418 U.S. at 351, 94 S. Ct. at 3012. The Court also held that such actual injuries "must be supported by competent evidence concerning the injury, although there need be no evidence which assigns an actual dollar value to the injury." *Id.*

I point out that our state rules regarding damages differ at present from the articulated rules set forth in *Gertz*. Presently, in a situation where presumed damages do not apply, South Carolina law requires that a plaintiff prove and plead special damages. Unlike the "actual injury" standard defined by the United States Supreme Court, we have more strictly defined "special damages." For instance, we have held that humilitation is not properly proven as a "special damage" without proof of some other injury or damage. *Brown v. National Home Ins. Co.*, 239 S.C. 488, 123 S.E. (2d) 850 (1962). There is at least an implication in some of our case law that damages of a pecuniary nature must be demonstrated where special damages are required. *See, e.g., Brown, supra.* The resulting system presently in place in South Carolina allows, depending on the circumstances, either: (1) presumed damages; or (2) narrowly defined "special damages." In my view, a less rigid scheme is required by the Supreme Court decisions. Whether our present rules should be retained is thus open to question, but is an issue not presented for our decision here.

[3] In light of *Gertz*, many of our cases stand, in my judgment, overruled or modified. *See Merritt v. Great Atlantic & Pacific Tea Co.*, 179 S.C. 474, 184 S.E. 145 (1936) (holding that in a slanderous or libelous *per se* context, actual damages need not *ever* be proved); *Jones v. Garner*, 250 S.C. 479, 158 S.E. (2d) 909 (1968) (adhering to same overly broad rule); *Manley v. Manley*, 291 S.C. 325, 353 S.E. (2d) 312 (Ct. App. 1987) (same); *Capps v. Watts*, 271 S.C. 276, 246 S.E. (2d) 606 (1978) (same); *Whitaker v. Sherbrook Dist. Co.*, 189 S.C. 243, 200 S.E. 848 (1939) (same). *See also Wilhoit v.. WCSC, Inc.*, 293 S.C. 34, 358 S.E. (2d) 397 (Ct. App. 1987) (citing the *Gertz* rule but failing to properly apply it).

in the judgment, expressing their views at that time that *Gertz* should be overruled entirely, and not just limited in its application. Moreover, and apparently for the first time, the Court intimated that it was of some import that the defendant in *Gertz* was a media defendant. Four dissenters protested mightily, pointing out that the language of *Gertz* did not indicate such limitations. Justice Brennan went so far to note, in dissenting, that six members of the Court at that point in time (the four dissenters and the two members concurring in the judgment) did not agree with Powell's view that whether the defendant was a media member was relevant. 472 U.S. at 783, 784, 105 S. Ct. at 2958 (Brennan, J., dissenting). The dissenters also disagreed with Powell's characterization of what kind of speech constituted a matter of "public concern."[4]

*Dun & Bradstreet* involved a private figure plaintiff suing a nonmedia defendant over speech of only private concern. In that context, wrote Justice Powell, "permitting recovery of presumed and punitive damages in defamation cases absent a showing of 'actual malice' (knowledge of falsity or reckless disregard for the truth) does not violate the first amendment." 472 U.S. at 764, 105 S. Ct. at 2947. Whether the present members of the Court will adhere to the rules announced in *Dun & Bradstreet* is not known.

The final case of importance in this area is *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 106 S. Ct. 1558, 89 L. Ed. (2d) 783 (1986). Although also a 5-4 decision, *Hepps* was recently cited with approval in the 7-2 decision styled *Milkovich v. Lorain Journal Co.*, 497 U.S. —, 110 S. Ct. 2695, 111 L. Ed. (2d) 1 (1990). The *Hepps* Court held that "the common-law presumption that defamatory speech is false cannot stand when a plaintiff seeks damages against a media defendant for speech of public concern." 475 U.S. at 777, 106 S. Ct. at 1564.[5] The Court specifically reserved judgment on the same question when a plaintiff sues a nonmedia defendant. Justice Brennan concurred specially to renew his objection

---

[4] The Court had previously disagreed over the meaning of "public concern" in *Connick v. Myers*, 461 U.S. 138, 103 S. Ct. 1684, 75 L. Ed. (2d) 708 (1983) (5-4 decision).

[5] The case of *Herring v. Lawrence Warehouse Co.*, 222 S.C. 226, 72 S.E. (2d) 453 (1952) should therefore stand overruled to the extent that its sweeping pronouncements conflict with *Hepps*.

that the media/nonmedia distinction is irrelevant; but in *Hepps* he was joined only by Justice Blackmun.

In this case, we are faced with a private figure plaintiff suing a media defendant over a matter of, in my view, private concern. The United States Supreme Court has not yet addressed such a scenario. We might do well to assume that the rules articulated in *Dun & Bradstreet, supra,* apply, and that Justice Brennan's view that a media/nonmedia distinction is irrelevant would prevail, although this prediction on my part of future Supreme Court action is just that, a prediction. The majority would of necessity agree with my prediction and interpret *Dun & Bradstreet* to apply here, since it focuses solely on South Carolina law and eschews any mention of first amendment "actual malice" and whether the speech here is of public concern. Even assuming, however, that *Dun & Bradstreet,* and thus South Carolina law, controls this particular case, I disagree strongly with the majority's interpretation of our state law.

## II. INTERPRETATION OF SOUTH CAROLINA DEFAMATION LAW

The phrase in the news article leading to the instant litigation was: "there simply was no family support to encourage her (the victim) to continue her education."[6] I generally agree with the majority's recitation of the applicable rules in South Carolina regarding libel. I strongly disagree with the majority's application of those rules to the instant controversy.

As the majority points out, the initial step in a libel analysis is to determine whether a statement is a defamatory one. "A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Restatement of Torts (2d) § 559 (1977). However, I would hold that it is unnecessary to determine whether the particular statement in this case is defamatory because in my view the plaintiff's defamation action should be dismissed for the fundamental reason that the statement is substantially true.

---

[6] The majority's recitation of other statements made in the news article directed only at Shannon have nothing to do with the instant action.

The majority also holds that certain extrinsic evidence of "how someone else perceived the [allegedly defamatory] words" is admissible on the issue of whether the instant statement was libelous, citing *Nettles v. MacMillan Petroleum Corp.*, 210 S.C. 200, 42 S.E. (2d) 57 (1947). Such evidence is admissible, as was stated by this Court in *Nettles*, when a statement is ambiguous and capable of either a defamatory or innocent meaning. As was stated at the outset of the opinion by Justice Fishburne in *Nettles*, "[t]he action [in *Nettles*] is for slander." *Id. Nettles* did not address the libel *per se*/libel *per quod* distinction in any manner whatsoever.

However, our decision in *Capps v. Watts*, 271 S.C. 276, 246 S.E. (2d) 606 (1978) is analogous to the instant case on this point. In *Capps*, the plaintiff was called a "paranoid sonofabitch" by the defendant. Extrinsic evidence was admitted demonstrating that such a comment could be and was understood by others to "impute personality traits and judgment deficiencies to the plaintiff which are incompatible with . . . [his job]." 246 S.E. (2d) at 609. The *Capps* court stated clearly that the resort to such extrinsic evidence indicated that the statement, if libelous, was libel *per quod*. Similarly, if extrinsic evidence in this case is used to determine the meaning of the allegedly defamatory statement, then such statement, in my view, is libel *per quod* if libelous at all. As such, the plaintiff would have the burden of proving special damages, since the instant statement does not fall within the four special categories of defamatory statements of: (1) crime, (2) loathsome disease, (3) unfitness for business, trade or profession, and (4) unchastity. The majority holds that the instant statement is libelous *per se*. Contradictorily, the majority's ruling permits the extrinsic evidence, yet *also* excuses the plaintiff from the burden of proving special damages.[7] Thus, while I do not deem it necessary to reach these issues, I note my disagreement generally with the majority's reasoning in this regard.

---

[7] The majority contends that "this [extrinsic] evidence would not be necessary to *supply* a defamatory meaning, but would merely explain whether readers, in fact, interpreted the article to convey a libelous meaning on its face." See majority opinion, fn. 5. This is illogical. Either the statement is libelous on its face, libelous *per se*, or it is ambiguous, libelous *per quod*. Only if it is ambiguous, would extrinsic evidence be admitted. *See Nettles, supra.*

## III. SUBSTANTIAL TRUTH AS A DEFENSE

This Court has held that a sufficient defense to libel is made out where the evidence demonstrates that the statement was *substantially* true. *Dauterman v. State-Record Co.*, 249 S.C. 512, 154 S.E. (2d) 919 (1967). Here, the record is replete with evidence that the victim was in fact without family support.

In 1978, when the victim was ten years old, her mother (the plaintiff) began an adulterous affair which lasted off and on until the trial in this case. (Tr. 230, 11. 14-15; 231, 11. 21-24) In 1981 the plaintiff was admitted to a hospital for emergency treatment, having taken a life threatening dose of a drug called Elavil. (Tr. 236, 11. 4-7) The plaintiff could not deny that she stated, during that same year, that "[w]hat scares me is I can't seem to love anymore. I care about my children but I can't seem to love them." (Tr. 243, 11. 9-16) The plaintiff made a conscious decision to stay on welfare rather than take a job. (Tr. 217, 11. 12-14)

The record indicates that the victim's father was a convict, unable to provide support for the victim for some time due to his incarceration. (Tr. 250, 11. 1-4) At one point, the victim was placed in the custody of her father with the plaintiff's permission. (Tr. 251, 11. 1-12) This was so despite the fact that the plaintiff stated that she had tried to kill him "twice and would kill him now if [she] thought [she] didn't have to go to jail." (Tr. 250, 11. 17-20) This is so also despite the fact that the plaintiff asserts that he once threatened to cut her nine month old son Joey's throat. (Tr. 253, 11. 17-20) The record also indicates that the plaintiff's son Joey was in 1984 arrested for housebreaking, auto breaking, attempted larceny, and other crimes, and was declared a delinquent. (Tr. 260, 11. 7-12)

Within a span of two years, the record shows, the victim was enrolled in five different high schools. (Tr. 255, 11. 16-18) The victim dropped out of school completely after October, 1984. (Tr. 255, 11. 13-15) One high school refused to give the victim academic credit as a result of excessive absences, which the plaintiff admitted were the result of the victim's playing "hooky," or being a truant. (Tr. 248, 11. 17-23) In October of 1984, the victim ran away from home with a carnival. (Tr. 257, 11. 1-4)

After the plaintiff managed to encourage Shannon to return home, Shannon stayed at home, never re-enrolling in school.

The plaintiff, by way of explanation, stated, "[s]he had missed so much until there was no reason for her to go back. She wouldn't have passed." (Tr. 257, 11. 18-20) The plaintiff admitted that she had not sought any help from the public schools to encourage Shannon to continue her education, since she did "not have much faith in the public school system." (Tr. 264, 11. 10-18) The plaintiff also did not avail herself of any of the various state agency help in getting Shannon back in school. (Tr. 266, 11. 20-23) Finally, the plaintiff rejected Department of Youth Services' advice that Shannon be forced to attend school. (Tr. 267, 11. 4-14)

While it may be true that the plaintiff did all she felt she could to further Shannon's education, and while it may be a fact that the plaintiff did lend minimal support in this regard, the appropriate test is whether the allegedly offensive statement is "substantially true." In my view, upon a review of the record, it is.[8]

I do not mean to advocate this kind of reporting, however. I dissent because I disagree that a valid defamation claim has been demonstrated by the plaintiff. Indeed, in my opinion, this news story was actionable if at all as an "invasion of privacy" claim. As stated in *Rycroft v. Gaddy,* 281 S.C. 119, 314 S.E. (2d) 39, 42 (Ct. App. 1984), "three different causes of action can arise under the tort of invasion of the right of privacy: (1) wrongful appropriation of personality; (2) publicizing of private affairs of no legitimate public concern; and (3) wrongful intrusion into private affairs." Here, the plaintiff may have been successful pursuing the cause of action set out in (2), above. While the murder itself was obviously of public concern, I am not convinced that the statements regarding the victim's family support are.

> "The right of privacy does not prohibit the publication of matter which is of legitimate public or general interest. Public or general interest does not mean mere curiosity, and newsworthiness is not necessarily the test . . . [o]rdi-

---

[8] The majority points to the trace amount of evidence tending to show that some bare family support was indeed given. This scintilla of evidence does not change my view that the statement at issue was *substantially* true. A reasonable juror could not, in my opinion, find in favor of the plaintiff.

narily, . . . whether a fact is a matter of public interest is a question of fact to be decided by a jury."

*Hawkins v. Multimedia, Inc.* 288 S.C. 569, 344 S.E. (2d) 145, 146 (1986).

Hence, if the plaintiff had pursued an invasion of privacy claim, the jury may have found in her favor, and whether the news statement is "substantially true" would be of no consequence.[9] I would accordingly affirm on all issues.

GREGORY, C.J., concurs.

---

[9] *But see The Florida Star v. B.J.F.,* 491 U.S. 524, 109 S. Ct. 2603, 105 L. Ed. (2d) 443 (1989) (although a truthful publication is not automatically constitutionally protected against a private action by a person, where the information was lawfully obtained by the publisher, damages and civil sanctions may be imposed only when narrowly tailored to a state interest of the highest order).