2277

John R. PARKER, Appellant v.
EVENING POST PUBLISHING CO., and Jim Parker, Respondents.
(452 S.E. (2d) 640)

Court of Appeals

*Walter Bilbro*, Charleston, and *A. Camden Lewis*, of *Lewis, Babcock & Hawkins*, Columbia *for appellant.*

*Jay Bender* and *Charles E. Baker*, Columbia, and *D.A. Brockington, Jr.*, Charleston, *for respondents.*

HOWARD, Chief Judge:

John Parker brought libel and invasion of privacy actions against the *Evening Post* and Jim Parker, one of its reporters (Defendants). The trial court granted a directed verdict to the Defendants on the privacy claim at the close of Parker's evi-

dence, and the jury returned a defense verdict on the libel claim. Parker appeals. We affirm.

In December 1988, Parker contracted to purchase the assets of Classic Lincoln-Mercury, Inc. (Classic), an automobile dealership then doing business in Charleston under the name of Heritage Lincoln-Mercury (Heritage). At the same time, Parker contracted to become the manager of Classic pending the closing of the assets sale. Parker had formerly been an automobile dealer in Charleston from 1982-1988 and, after assuming management of Classic, he ran newspaper and radio ads announcing that he was back in the car business at Heritage.

In March 1989, Parker formed Parker Lincoln-Mercury, Inc. to operate the dealership after the closing of the sale in May 1989. The closing memorandum prepared in connection with the sale provided that "in lieu of [Classic's] compliance with the South Carolina Bulk Sales Act," Classic would pay all creditors when due and would indemnify Parker.[1] At the time of the sales agreement and the closing, Yulonda Adams had a lawsuit pending against Classic for fraud, conversion, and violation of the car dealer's unfair trade practices act (S.C. Code Ann. §§ 56-15-30 to -40 (1976)).

In June 1989, Adams submitted a pretrial brief pursuant to Rule 16(c), SCRCP, in her action against Classic. This brief stated in pertinent part:

### UNUSUAL MATTERS

The only unusual matter in this case involves the identity of the Defendant. Apparently, the dealership was sold, and the name was changed to Heritage Lincoln-Mercury, Inc. Subsequently, the dealership was again sold to John Parker, and it is now John Parker Lincoln-Mercury, Inc. However, the Defendant [Classic] made no attempt to comply with the Bulk Sales Act, and Heritage has filed an affidavit with the South Carolina Department of High-

---

[1] Under the Uniform Commercial Code-Bulk Transfers Act, S.C. Code Ann. §§ 36-6-101-111 (1976), the transfer in bulk of all or a major part of the inventory of a business is not effective against existing creditors of that business unless the transferee gives notice to the creditor at least ten days before the transferee takes possession of or pays for the goods. S.C. Code § 36-6-105. We will refer to the act, as do the parties, as the Bulk Sales Act.

ways and Public Transportation swearing that Classic and Heritage are one and the same dealership. Therefore, if the Defendant's [Classic's] attorney believes that his client can sit back and let Mrs. Adams obtain a judgment against Classic without risk to Heritage or John Parker, he may be mistaken.

This part of the brief would later be referred to and quoted from in the newspaper article, and it is the principal matter giving rise to the present lawsuit.

In July 1989, a jury returned a verdict for Adams against Classic, resulting in a judgment of $716,000.50 for actual damages, punitive damages, attorney's fees, and costs. On August 3, 1989, the *Evening Post* ran an article authored by the reporter and entitled "Car buyer awarded $700,000 in dispute." This article appeared on the first page of the Region section and continued on the third page.

The article opened: "A *former* Charleston car dealership has been ordered to pay nearly $700,000 to a local woman." (Emphasis added.) The remainder of the first page of the article cites the attorneys for both sides and Adams' pretrial brief as sources for its summary of the allegations, referring to the defendant as Classic Lincoln-Mercury, Inc. or Classic six times. The brief was the major source for the factual information in the article regarding Adams' claim against Classic, and the article repeatedly identified the brief as a source. The article also noted that, according to its attorney, Classic had appealed the case.

The article continued on page 3-B of the newspaper, identifying the same three sources of information—the two attorneys and the brief. The two paragraphs giving rise to the present lawsuit state in full:

It's unclear who is liable in this case. Classic *since has been sold*, first becoming Heritage Lincoln-Mercury, Inc., and now *John Parker Lincoln-Mercury, Inc.* In *the brief*, Buckley [Adams' attorney] *argues* that if the lawyer for Classic lets Mrs. Adams obtain a judgment against Classic *without risk* to Heritage or *John Parker*, "he *may be* mistaken." Gowder [Classic's attorney] said since the case is on appeal, there's no reason to speculate on liability. (Emphasis added.)

The article continues to report the matter, but the reminder is not in the record except for a few sentences of the paragraph following the above-quoted paragraphs. The article did not mention the Bulk Sales Act, the brief's basis for the liability of Parker's dealership.

On August 9, 1989, Adams filed an amended complaint against Parker and his dealership for recovery of her judgment against Classic from the assets bought by Parker, alleging that Parker had actual notice of Adam's pending claim at the time of the assets sale and did not give her notice prior to the assets transfer, thus violating the Bulk Sales Act. Adams ultimately settled this lawsuit against Parker and his dealership for $30,000 "paid by or on behalf of" them whereby Adams, *inter alia,* agreed to apply the $30,000 to the judgment against Classic. Parker apparently did not personally provide any of these monies—its appears that Classic paid pursuant to the indemnification clause in the closing Memorandum acknowledging noncompliance with the Bulk Sales Act.

On appeal, Parker argues (1) the trial court improperly charged the jury on his libel claim; (2) the trial court improperly directed a verdict against his privacy claim; and (3) the trial court improperly denied his new trial motions based on the "thirteenth juror" doctrine and juror misconduct.

## I.

The jury returned a verdict in favor of the Defendants on Parker's libel claim. On appeal, Parker challenges the jury charge on his libel claim, arguing that the trial court improperly placed on him the burden of proving falsity of the statements in the article. Parker contends he is a private figure and the subject matter of the article was of purely private concern, thus placing his libel claim outside the realm of constitutional defamation created by *New York Times Co. v. Sullivan*[2] and its progeny. We disagree.

At common law, a plaintiff can recover damages for a false spoken or written statement which damages his reputation if he can show that the statement (1) had a defamatory meaning; (2) was published with actual or implied

---

[2] 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed. (2d) 686 (1964).

malice; (3) was false; (4) was published by the defendant; (5) concerned the plaintiff; and (6) resulted in presumed damages or in special damages to the plaintiff. F.P. Hubbard & R.L. Felix, *The South Carolina Law of Torts* 390-91 (1990). However, the common law presumed a defamatory statement to be false, and it was considered error to instruct the jury that the plaintiff must prove falsity. *Id.* at 398.

In *Sullivan*, however, the United States Supreme Court recognized that the First Amendment's guarantees of freedom of speech and of the press place certain limits on the right of the states to award damages in a libel action. 376 U.S. at 256, 84 S.Ct. at 713. These limitations are necessary to ensure free and unfettered discussion of matters of public concern, because "[t]he protection of the public requires not merely discussion, but information. . . . Whatever is added to the filed of libel is taken from the field of public debate." *Id.* at 272, 84 S.Ct. at 722. Thus, a public official may recover damages for defamatory statements relating to his official conduct only if he proves that the statements were made with actual malice. *Id.* at 279-80, 84 S.Ct. at 725-26. The *Sullivan* rule also applies to libel actions brought by public figures. *See, e.g., Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed. (2d) 1094 (1967). The same First Amendment concerns likewise invalidate some of the common law defamation requirements in cases involving private figures and matters of public concern. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed (2d) 789 (1974); *see also* Hubbard & Felix, *supra,* at 415-16. Thus, in private figure cases involving matters of public concern, the common law presumption of falsity is invalid—the plaintiff must prove the statement was false. *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed (2d) 783 (1986). Therefore, as Parker conceded at oral argument, the dispositive issue here is whether the article involved a matter of public concern. If so, then Parker's claim is governed by *Hepps,* and the jury was properly charged.[3]

---

[3] Thus, whether or not Parker is considered a public figure, his claim is subject to the requirements of *Hepps* if the challenged statements involve matters of public concern. However, we believe that by extensively advertising his return to the car business, Parker became a public figure, at least in the limited area of his business dealings. *See Sunshine Sportswear & Elec., Inc. v.*

The article Parker challenges discussed Classic's use of a "straw purchase" in the sale of a car to Adams, and Classic's subsequent repossession of the car. The article focused primarily on Classic and its actions, and clearly attributed the actions giving rise to the Adams lawsuit to Classic. While lawsuits and other items of public record are generally of concern to the public, the Adams lawsuit was of particular importance to the public in that it involved allegations of fraud and unfair trade practices. Given the nature of Classic's conduct, the public certainly had a valid interest in the Adams lawsuit. The article informed the public of the pitfalls of some consumer credit transactions, and served to warn the public about certain unfair credit practices. That the new owner of the dealership, for whatever reason, might bear some responsibility for the damages awarded in the lawsuit is likewise of public interest. The public has a legitimate interest in being informed of potential methods for collecting a judgment, particularly when the judgment resulted from unfair credit practices.[4] This conclusion is reinforced by *Meetze v. Associated Press*, 230 S.C. 330, 95 S.E. (2d) 606 (1956), the seminal South Carolina privacy case.

In *Meetze*, the plaintiff was a married twelve-year-old girl who had given birth to a child. In a brief visit with reporters at the hospital, she specifically stated that she did not want any publicity and refused to give an interview (as did her husband), but the newspaper nevertheless reported the birth and identified the parents. The trial court sustained the newspaper's demurrer to the plaintiff's claim for invasion of privacy, and the Supreme Court affirmed, finding that it was rather unusual for a twelve-year-old girl to give birth to a child, and

---

*WSOC Television, Inc.*, 738 F. Supp. 1499 (D.S.C. 1989) (plaintiff who advertised its business extensively became limited public figure in defamation action based on broadcast questioning the plaintiff's manner of conducting business). Through his advertising campaign, Parker invited the public's attention and assumed the accompanying risk of that attention. Thus, as to statements regarding Parker's dealership, it seems clear that Parker is a public figure.

[4] The fact that the article did not mention that Parker's liability stemmed from a violation of the Bulk Sales Act does not render the article inaccurate or somehow negate the public interest in the article. Regardless of the source of Parker's liability, the public has a right to know that, at least in some circumstances, the purchaser of a business may be responsible for debts of that business.

it was a "biological occurrence which would naturally excite public interest." *Id.* at 338, 95 S.E. (2d) at 610.

Here, it is undisputed that the judgment against Classic Lincoln-Mercury was a matter of public interest, and that Parker's purchase of the dealership was not private information. It is likewise undisputed that, prior to publication of the article, Parker voluntarily conducted an intensive newspaper and radio advertising campaign announcing his connection with the former dealership and inviting the public to conduct business with him. Parker invited the public's attention to his purchase of the dealership; he cannot now say that the public has no legitimate interest in his potential liability for a judgment obtained against that dealership. Parker, by his own acts, whether willingly or not, became connected with the occurrence of the judgment against Classic Lincoln-Mercury and, therefore, the publication of his connection with the occurrence was not an invasion of privacy. If the public has a legitimate interest in knowing that a twelve-year-old girl give birth to a child as a matter of law, it likewise has a legitimate interest in knowing that the purchaser of a car dealership may be liable for the debts of the former owner as a matter of law. Accordingly, we find the entire article, including the limited reference to Parker, involved matters of public concern.

Because the entire article involved matters of public concern, Parker's libel claim falls squarely within the framework of *Sullivan, Gertz,* and *Hepps.* The trial court therefore properly placed on Parker the burden of proving falsity. Moreover, viewing the evidence and reasonable inferences in the light most favorable to Parker, we find that the article was substantially true as a matter of law. This is an absolute defense that moots all jury charge questions. See *Ross v. Columbia Newspaper, Inc.,* 266 S.C. 75, 221 S.E. (2d) 770 (1976) (affirming directed verdict granted to the newspaper); *Dauterman v. State-Record Co.,* 249 S.C. 512, 154 S.E. (2d) 919 (1967) (affirming judgment notwithstanding the verdict granted to the newspaper); *Haulbrooks v. Overton,* 295 S.C. 380, 368 S.E. (2d) 676 (Ct. App. 1988) (affirming directed verdict to television station). The jury returned a defense verdict, and we may affirm this result for any reason appearing in the record. *See* Rule 220(c), SCACR.

## II.

The trial court directed a verdict against the cause of action Parker characterized as "False Light/Invasion of Privacy." Noting the absence of any South Carolina authority recognizing the tort of "false light," the trial court treated the claim as one of invasion of privacy, that is, public disclosure of private facts. Parker acknowledged the absence of South Carolina authority on "false light," but summarily argued it should be recognized as a tort. The trial court's ruling focused on the undisputed fact that Parker had announced his involvement with the car dealership to the public prior to the article. Parker conceded this made his involvement somewhat public, but he argued that the article went further and exposed his financial situation (potential liability to Adams), and "that is why it is an invasion of his privacy."

On appeal, Parker focuses on the tort for public disclosure of private facts, although he continues to argue summarily that South Carolina should recognize the tort of false light.[5] Parker concedes that his purchase of the dealership was not private information, but he argues any potential liability for the acts of, or judgment against, Classic Lincoln-Mercury due to the operation of the Bulk Sales Act was not a matter of public concern. We disagree.

A cause of action for public disclosure lies only for disclosure of private facts which are of no legitimate public concern. *Rycroft v. Gaddy*, 281 S.C. 119, 314 S.E. (2d) 39 (Ct. App. 1984). Because we have already held that the article involved matters of public concern, Parker's privacy claim must fail.[6] We do not overlook Parker's argument that our Su-preme Court in *Holtzscheiter v. Thomson Newspapers, Inc.*, 306 S.C. 297, 411 S.E. (2d) 664 (1991) found that a seventeen-year-old girl's lack of family support was a private matter, although her murder was a public matter, and that the present case likewise presents a situation of general public in-

---

[5] We find that Parker's appellate argument regarding false light is so conclusory as to be an abandonment of the issue and, therefore, we do not consider whether this tort exists under South Carolina law. *See Matthews v. City of Greenwood*, 305 S.C. 267, 407 S.E. (2d) 668 (Ct. App. 1991).

[6] Parker acknowledged at oral argument that if the statements in the article were of legitimate concern to the public, both his libel and invasion of privacy challenges would fail.

terest with private matter elements. However, as previously discussed, we find that the entire article, including the references to Parker, involved matters of legitimate public concern. *Holtzscheiter* therefore provides no assistance to Parker. Accordingly, the trial court properly directed a verdict against Parker's invasion of privacy claim.

### III.

The trial court denied Parker's posttrial motion for a new trial under the "thirteenth juror" doctrine. Under this doctrine, the trial court may take its own view of the evidence and grant a new trial if it disagrees with the jury's verdict. *Folkens v. Hunt*, 300 S.C. 251, 387 S.E. (2d) 265 (1990). On appeal, our standard of review is limited to whether any evidence supports the trial court's decision; thus, we must view the evidence and all reasonable inference therefrom in favor of the trial court's ruling. *Id.* Therefore, to reverse the denial of a new trial motion under this doctrine we must, in essence, conclude that the moving party was entitled to a directed verdict at trial. We find that ample evidence supports the trial court's denial of the motion, and we therefore affirm.

The trial court also denied Parker's motion for a new trial upon the ground that the court erred in refusing to excuse a juror during trial and replace her with the alternate juror. Parker contends the juror exhibited disruptive conduct during the trial, including impatience with the length of the trial and a desire to go home at 5:00 p.m. during the five days of trial.[7]

The determination of whether any person has a coercive effect on a jury for any reason is a matter addressed to the sound discretion of the trial judge. *See Blake v. Spartanburg General Hosp.*, 307 S.C. 14, 413 S.E. (2d) 816 (1992) (affirming trial judge's conclusion that bailiff's improper

---

[7] Parker also appears to argue that the jury did not give due and serious consideration to the case, because it returned a verdict in one hour, thereby ending their deliberations one-half hour before the NCAA basketball tournament was to begin on television. This is rank speculation without any evidentiary support, and we find it to be manifestly without merit. *Cf. Bratton v. Lowry*, 39 S.C. 383, 17 S.E. 832 (1893) (new trial not warranted where one juror advised the trial judge that some jurors had said the jury rendered a hasty verdict due to an alarm of fire in the town).

comments to the jury warranted new trial). The test is whether there is reason to suppose outside influences affected the jury's verdict. This determination rests within the sound discretion of the trial court, because the court has the opportunity to view the trial, the character and intelligence of the jurors, and to consider whether the verdict, in light of the evidence, has so little support as to indicate corrupt or improper influence. *Id; see also Morris v. Jensen*, 309 S.C. 153, 420 S.E. (2d) 710 (Ct. App. 1992) (no abuse of discretion in refusing new trial where juror stated that forelady, whose husband had been involved in an accident similar to that at trial, was so overbearing that she convinced other jurors to vote in a manner they might not have otherwise voted; juror's un-sworn statement was not competent evidence of undue influence, and the trial judge found that the evidence supported the jury's verdict).

Here, the record contains no competent evidence that the juror unduly influenced the jury or its verdict. During its deliberations, the jury requested that a crucial exhibit be sent to the jury room, thereby demonstrating its serious consideration of the case. The trial court polled the jury after its verdict, and each juror affirmatively stated that it was his or her true verdict. Finally, there is ample evidence in the record to support the jury's verdict. We therefore find no abuse of discretion in the trial court's denial of the new trial motion or the refusal to seat the alternate juror.

Accordingly, for the foregoing reasons, the judgment below is hereby

Affirmed.

SHAW and GOOLSBY, JJ., concur.