MICHAEL LINNEY v. JULIA MATON, BY HER NEXT FRIEND.

It seems that calling a woman a whore, is not actionable without special damage.

That a marriage engagement was broken off thereby, is a sufficient allegation of special damage, to sustain an action for calling the plaintiff a whore.

The general averment that the slanderous words were "published," without averring that they were uttered or spoken in the presence and hearing of any one, might not be sufficient, if the petition had been excepted to on the ground that the publication of the words was not sufficiently averred, yet we think it sufficient on general demurrer.

See this case for circumstances under which it was held that the plaintiff was not entitled to recover in an action for calling her a whore, whereby, she alleged, her marriage engagement had been broken.

Refusal of the Court below to grant a new trial on the ground that the verdict was not supported by the evidence, reversed and cause remanded.

Appeal from Liberty. This was a suit for damages commenced by the appellee, on account of slanderous words published by the appellant of and concerning her. The words charged were "She is a damned lying whore," "You are a damned lying whore." By the publishing of which words plaintiff charged she had been greatly injured in her credit and reputation and brought into public scandal, infamy and disgrace with and amongst her friends and neighbors; and that one Stephen P. Brashear, with whom she was about to be married, had, in consequence of these words, broken off his engagement and refused to marry her. Damages laid at $10,000. The defendant filed a general demurrer and general denial. The demurrer was overruled and verdict and judgment for $1000 damages. Motion for new trial overruled.

The evidence was:

John Maton, the father of the plaintiff, testified as follows: He, John Maton, and defendant, were in dispute about a fence which said Linney was pulling down, about three hundred yards from Maton's house, both parties claiming the fence as their own; Julia Maton, the plaintiff, hearing the loud words,

went out to them and requested him, said Maton, to come away, for Linney was nothing but a negro, and she would not quarrel with a negro; whereupon said Linney called Julia Maton, the plaintiff, "a damned lying whore;" that Julia Maton, the plaintiff, was engaged to be married to one Stephen P. Brashear; and that he, said Maton, after the speaking of the said words by said Linney, went for consultation with C. D. Brashear and Mrs. Brashear, both, the parents of said Stephen Brashear, and they both agreed that it would not be proper for the said Stephen Brashear and the said Julia Maton, the plaintiff, to marry, in consequence of the slanderous words spoken by said Linney about the said Julia Maton, until said matter was cleared up; that there was no one present when said words were spoken, but himself and Julia Maton, the plaintiff.

Stephen Brashear stated that he was engaged to marry said Julia Maton, the plaintiff, but his mother, Mrs. Brashear, told him of the slanderous words spoken about Julia Maton by said Linney; for and in consequence of the said slanderous words, I broke off the marriage with Julia Maton, the plaintiff. My mother told me that she was informed of the words spoken, by said John Maton; that he, Stephen Brashear, did not believe that the slanderous words were true; that it did not change his opinion with regard to her, said Julia Maton; that he broke off the marriage with said Julia Maton in consequence of the charge made by said defendant; that there was no private understanding about their getting married, but when the charge was cleared up by decree of the Court, they might yet marry; that he still visited said Julia Maton on friendly terms, and esteemed her as before the speaking of said slanderous words about her; that he did not believe them to be true; that the neighbors all received said Julia Maton as friendly and kindly as before the speaking of said words; and that he did not think any one in the neighborhood believed said words to be true.

Ralph Brashear stated that his brother Stephen Brashear

was in the habit of visiting Julia Maton, as well after as before the speaking of said slanderous words by said Linney; that said Linney, the defendant, had a marriageable daughter which the said Stephen was in the habit of visiting, both before and after the alleged speaking of said slanderous words, by said Linney, about said Julia Maton.

James Darman was then introduced by the defendant, who stated that he was camped near the said John Maton's house, about the time said difficulty occurred between the said John Maton and the said Linney, the defendant; that he heard loud talking, and ran up to see a fight, as he supposed; that when he got there, said Linney and said John Maton were in a quarrel about a fence which each claimed as their own, and Linney was pulling down; that Linney was very angry; that said John Maton and Julia Maton accused Linney with calling her, Julia Maton, "a whore," which said Linney denied, and they, the two said Matons and Linney agreed to leave it to him, the said Darman, whether the said Linney had said so or not, and he stated that he did not hear it, that he was a hundred yards off when the fuss began; that Julia Maton, the plaintiff, called Linney, the defendant, a negro; that Linney said to her, if she was a man he would knock, or slap the piss out of her.

Mrs. Hardin's deposition. I am acquainted with the parties. I have conversed with Miss Julia Maton about said suit; do not remember the date or month, but think it was next morning after the dispute between the parties. She told me that she would kill any person that would insult her. She also said that she had a poisoned dagger. I asked her why she had not killed Mr. Linney. She said that she did not wish to kill him, but that she would rather have his property. She told me that she, the said Julia Maton, intended having Mr. Linney's brand changed and her own recorded for the purpose of branding said Linney's cattle. She moreover said that she at first intended suing for $5000, but that Mr. Brashear had told her that she was foolish, and to bring suit

for ten thousand dollars. She said a great deal that I have forgotten.

*Palmer & Jordan*, for appellant. I. The principal point relied upon on the demurrer is that the words were not actionable *per se*, and that the plaintiff did not allege such special damage as would sustain an action upon words not actionable *per se*. (2 Hawks, 52; 2 Ired. Dig. 779; Boyd v. Brent, 3 Brevard, 241; 2 U. S. D. Supl. 332, Sec. 125; 3 Steph. N. P. 2557; 8 Am. Com. Law, p. 107–109, note 110, 111.)

In order to maintain an action of slander for words not actionable *per se*, the plaintiff must both allege and prove that by reason of the words he has sustained some damage of a pecuniary character. If the injury consists of mere mental or bodily suffering, loss of society, or of the good opinion of the neighbors, unless the party has been injured in estate or property, she cannot sustain an action on words not actionable *per se*. (Beach and Wife v. Ranney and Wife, 2 Hill, 309.)

In the case last cited, which was similar in its nature to the present, in addition to all the facts set out in the present, the petition alleged the abandonment of her husband, without averring pecuniary loss, and the petition was held insufficient, and plaintiff forced to take a nonsuit.

II. The petition is insufficient in not charging that the words were uttered in the presence and hearing of others. To charge that the defendant published the words, without this is not sufficient. (Watts v. Greenlee, 2 Dev. 115; 2 Supl. U. S. D. p. 329, Sec. 297.)

III. Although it is believed that the plaintiff was not entitled to recover upon the facts alleged in her petition, it is confidently asserted that the facts alleged were not sustained by the proof. The evidence fell far short of showing any special damage either in fame or fortune, but did show that if she had so suffered, the defendant ought not, under the circumstances, to have been held responsible for the same. (Vicars v. Wilson, 8 East. R. ; Ward v. Weeks, 7 Bing. R. 211.)

*H. N. & M. M. Potter*, for appellee.  A female charged
with being a prostitute may maintain an action, provided she
can prove special damage; and any damage, however slight,
is sufficient to sustain the action.  (Bradt v. Towsley, 13 Wend.
R. 253; Moore v. Meagher, 1 Taunt. R. 39; Moody v.
Baker, 5 Cow. R. 351; Douglass v. Toussey, 19 Wend. R.
352.)

In this case it was stated in the petition and proved, at the
trial, that the plaintiff Julia Maton was engaged to marry one
Brashear and that by reason of the slander said Brashear broke
off the engagement and refused to marry her.  This certainly
was special damage.  Had Brashear broken off the engage-
ment under other circumstances, he would have been liable in
an action for breach of promise, and in such action there is
no settled rule as to damages.  That rests in the sound dis-
cretion of the jury.  (Southard v. Rexford, 6 Cow. R. 254.)
The same is the rule in this action.

In slander, a new trial will not be granted on the ground of
excessive damages, if there are no good grounds to believe the
jury were influenced by prejudice, passion or partiality. (Moody
v. Baker, before cited; Douglass v. Toussey, 2 Wend. R. 352.)

WHEELER, J.  It must be admitted that, according to the
great weight of authorities, the slanderous words charged in
the petition, are not actionable at the Common Law, without
the proof of special damage.  "It is now too late (said Ch. J.
"Savage, in Bradt v. Towsley) to interrupt the current of au-
"thority adjudging that words charging a female with lewd-
"ness are not actionable, though it is very palpable that the
"presumption of damage is quite as strong as in any case
"in which it is presumed.  For instance, damage is presumed
"if one charges a clergyman with intemperance or profligacy,
"because they tend to his temporal damage.  So a charge of
"dishonesty in a lawyer, bankruptcy in a merchant, ignorance
"in a physician, and many other cases; but where a charge
"of want of chastity is made against a female, which has a

" tendency to destroy her character and prospects in life, no
" action lies unless she can prove special damage. The Courts
" have long regretted that they had not authority to judge dif-
" ferently ; they have not the power ; and legislators have not
" the inclination to do justice to injured female innocence.
" The Courts, sensible of the injustice of the law in this re-
" spect, have shown an inclination to lean in favor of such
" plaintiffs ; and any damages, however slight, have been held
" sufficient to sustain the action." (13 Wend. R. 254.)

In some of the States this reproach of the Common Law has
been effaced by legislative interposition. (2 Bailey, 115 ;
Litt. Sel. Cas. 187.) And that we have not had similar legis-
lation is, doubtless to be ascribed, not to the cause imputed
by Chief Justice Savage, but to inadvertence. The attention
of the Legislature has not been called to the subject. The
Courts would doubtless go as far, as any warrant can be found
in the law, in holding, that " any damage, however slight,
will be sufficient to maintain the action." What will be suffi-
cient, has been the subject of frequent adjudication. But it
is not necessary further to consider the subject here, than to
ascertain whether the loss of a marriage engagement will be
sufficient. This question was considered and determined by
the Supreme Court of New York in the case of Baker v.
Moody, (5 Cowen, R. 351,) and it was there held, by a major-
ity of the Court, that an action will lie for words not action-
able in themselves, in consequence of which a marriage con-
tract between the plaintiff and another was violated by the
latter ; though the plaintiff had an action against the latter
for the breach of the contract.

The remaining ground urged in the support of the demurrer,
would have been entitled to more consideretion, had it been
taken by exception in the Court below. Though the general
averment that the slanderous words were " published," with-
out averring that they were uttered, or spoken in the presence
and hearing of any one, might not be sufficient, if the petition
had been excepted to on the ground that the publication of the

words was not sufficiently averred, yet we think it sufficient on general demurrer.

The view which we entertain of the merits of the case, upon the evidence, will dispense with the necessity of considering particularly the other questions raised by the assignment of errors.

It appears from the evidence that the father of the plaintiff, and the defendant were engaged in an angry and excited controversy. Their quarrel was so loud and angry as to induce a witness at a distance to run up, as he said, expecting to see a fight. During this quarrel, the plaintiff interposed, calling the defendant a negro; and it was upon this, the witness, her father, states that the defendant uttered the slanderous words for which the action is brought. But another witness, and it seems, the only dispassionate witness of the dispute and quarrel, did not hear, and when appealed to at the time, stated he did not hear the words imputed to the defendant; though he did hear the epithet applied by the plaintiff to the defendant, and other opprobrious epithets used by the defendant. The defendant at the time positively denied using the words, and the witness did not hear them; though he testified distinctly to having heard the language used by the plaintiff, which seems to have provoked them. It is quite certain that, if the defendant did use the words ascribed to him, he instantly retracted them; they were uttered when under the excitement and heat of passion; in a bandying of epithets which seems to have been begun by the plaintiff herself; retorted without time for reflection, while smarting under the lash of the tongue, repelling, in kind, an assault of the tongue. Under such circumstances, can it be supposed that the words were used with any reference to the character of the plaintiff for chastity; or that it was even thought of; or that the plaintiff or her father for a moment really believed the words were used with the intention or design of affecting her reputation in the community. Such language used to a female, upon any provocation, however great, shows the defendant to have been shamefully de-

void of a sense of decency, and even self-respect; but, under the circumstances, it is far from showing an act of wilful, deliberate slander. But it seems the father, under the influence of passions excited by his quarrel with the defendant, immediately held a consultation with the parents of the intended husband; and it was resolved by these three persons, even before the provocation was known to the son, that it would not be proper for the intended marriage to take place, "in consequence of the slanderous words spoken," until the matter was "cleared up." And what was there then which it was so important to have cleared up, as that such consequences must ensue? No slanderous report had been put in circulation. No shade had been cast upon the young lady's reputation. That was as fair, and it seems, notwithstandtng the publicity, which those having charge of it, have given to the quarrel, continues as fair as before. The words, if uttered, had been instantly retracted: no one one else had heard them: and, since their publication by the parties themselves, no one has ever believed them; or suffered them to influence their conduct towards the lady; except the intended husband; whose conduct it was necessary should be influenced in order to sustain a suit for damages: and whose conduct, therefore, was determined upon for him, before it was made known to him. It having been determined by the parents that the marriage must be suspended, until the matter was "cleared up," the mother communicated the words spoken to her son; and he, as a dutiful son, although, as he testifies, not himself believing them, and knowing they were not believed by any one else, or indeed known out of the family, "broke off the marriage:" his father became next friend of his intended bride in bringing the suit; and he, the son, thought they might yet marry, after the charge was "cleared up by a decree of the Court." And, upon this testimony, and such a state of case, the matter was, accordingly, cleared up, by a verdict and judgment for the plaintiff for a thousand dollars damages. The conduct of the parties, in first giving publicity to the slander, and then

making it the ground of violating the most solemn and sacred of all personal engagements, a marriage contract; when it had not, and but for themselves never would have obtained publicity or been known even to the party, who, it is alleged, was thereby induced to break off his engagement, is, to say the least of it, very remarkable. If a key had been needed to solve any apparent mystery in so strange and unnatural a procedure, it might have been found in the testimony of Mrs. Hardin; who testified that, on the morning after the quarrel, the plaintiff stated that she was advised by Mr. Brashear (the name of the father of her intended husband, who sues as her next friend) to bring a suit for ten thousand dollars; that she preferred his property to certain other terrible revenge which she spoke of, and that she intended having his cattle branded with her brand. If the conduct of the parties, was extraordinary, it must be conceded of the finding of the jury, with this exposition of the motive which actuated the parties in bringing the suit, and under the charge of the Court, which sufficiently indicated the apprehension of the presiding Judge, that such was the motive, that the verdict, is, perhaps, entitled to be considered as extraordinary, as anything which has often occurred in the history of judicial proceedings. The jury were probably influenced to find for the plaintiff by their sense of the shamelessness and enormity of using such language to a female. But they seem not to have duly considered for what purpose, and to what end it is that the law has given this action; or to have viewed, in its true light, the conduct and motives of the party plaintiff. To add comment upon the testimony would be an ungrateful task: it might do injustice to those who appear to have been mislead by the misguided counsel of others, whose seniority, and sense of paternal duty, should have taught them more discretion. It will suffice to say, that it is difficult to resist the conviction, that the counsel which prevailed, was dictated more by a spirit of vindictiveness, or cupidity, or both, than by a just sense of paternal regard and duty, or a desire to vindicate the claims of injur-

ed innocence, and to obtain redress for real or supposed injury done to the fair reputation of the plaintiff; that it was as reckless of the best interests of those who were governed by it, as it was in every point of view, injudicious and unwise: and that the suit was as malicious, as it was unfounded and causeless.

If the defendant had really been guilty of uttering or giving publicity to a wilful, deliberate slander, of so grave a character as that charged, there are scarcely any damages, which an unprejudiced jury would give, which the law would deem excessive. But to permit a verdict, for any amount, to stand, which perverts the beneficent principles, and the process of the law, to such purposes, as the record in this case discloses, would ill comport with the character of a Court of Justice. There is a salutary principle of law and justice, which will avert such a consequence. That is, that if slanderous words spoken are immediately retracted, in the same conversation, and in the hearing of all who heard them spoken; so as to show that the speaker meant no imputation, and to leave none on the minds of the hearers, it does not amount to slander, and no action can be maintained. (Trabue v. Mays, 3 Dana, 138.) There can be no question that such was the case in this instance. The use of the words was denied by the defendant, the moment he was accused of having used them. If uttered, they were instantly retracted. The injury, if any has resulted, was not occasioned by the speaking of the words; but by the folly and wrong of attempting to convert them into a legal weapon to wreak vengeance upon another. The verdict was manifestly against law and evidence, and should have been set aside. The judgment is therefore reversed and the cause remanded.

Reversed and remanded.