**HAN YE LEE, Plaintiff–Appellant,**

v.

**COLORADO TIMES, INC.; Yeunho Shin; and Kim Chang Kuen, Defendants–Appellees.**

No. 08CA2233.

Colorado Court of Appeals, Div. I.

Oct. 29, 2009.

Richard C. Whaley, P.C., Richard C. Whaley, Colorado Springs, CO, for Plaintiff–Appellant.

Richard C. Cornish, Englewood, CO, for Defendants–Appellees.

Opinion by Judge TAUBMAN.

Plaintiff, Han Ye Lee, contends the trial court erred in granting partial summary judgments for defendants, Colorado Times, Inc., Yeunho Shin, and Kim Chang Kuen, dismissing her claims of defamation and extreme and outrageous conduct. We reverse both partial summary judgments and remand for further proceedings.

## I. Background

This case stems from a column published in the Colorado Times, a Korean language newspaper distributed for free to the Korean community in Colorado. On Memorial Day 2001, Lee witnessed the murder of her husband during an armed robbery of their liquor store in Colorado Springs. The shooter, Robert Hood, was accompanied by another man, identified by police as Thurman Barnes. Hood pled guilty to the murder and was sentenced to life in prison. Barnes pled not guilty but was found guilty at his trial as an "accomplice to the murder." Barnes's conviction was overturned on appeal and Barnes was found not guilty in a second jury trial.

A year after Barnes's second trial, the editor of the Colorado Times, Kuen, wrote a column headlined, "The Grief of Loss of Husband, the Joy of Loss of Husband," published on November 17, 2006. The column recounted a story about the loyalty and bravery of a Korean general's wife. It then described the murder of a Korean liquor store owner in Colorado Springs during an armed robbery that had occurred three or four years previously. The column commented that the murder was a shock to the local Korean community and that many peo-

ple had donated money to a campaign organized by the local liquor store association to assist the victim's family and help catch the suspects. Kuen then discussed the trials of the two men charged in the murder and opined that Barnes went free because the victim's wife did not testify at or attend his second trial.

As relevant here, the column said, "It's never understandable that the victim's family didn't show up for the trial." Kuen did not mention Lee by name and claimed he was quoting information in an article published by another newspaper, the Colorado Springs Gazette.

After Lee protested that the column was false because she was present and testified at both of Barnes's trials, the Colorado Times published a retraction in its next issue. There, Kuen apologized for the inaccuracies in the column and admitted that the quoted material had never been published by the Colorado Springs Gazette. The retraction column acknowledged that the quotes were actually rumors Kuen had heard from a local Korean man who said he saw an article in the Gazette. However, no such article had been published by the Colorado Springs Gazette. In addition, the retraction column suggested Lee had testified at Barnes's second trial but did not explicitly acknowledge that she testified. The retraction concluded, "We apologize to the victim's wife and the family for causing emotional pain by writing the bogus information."

On April 27, 2007, Lee sued the Colorado Times, its owner, Shin, and Kuen for defamation and extreme and outrageous conduct. She alleged that she suffered emotional stress and humiliation in the Korean community and her reputation was injured.

On July 16, 2008, the trial court granted defendants' motion for partial summary judgment on the defamation claim, holding that Lee's claim failed because she did not allege special damages, a requirement for proving libel per quod rather than libel per se. Because the partial summary judgment was entered two days before Lee's deadline to respond, Lee filed a motion for reconsideration, which the trial court denied.

Two months later, the trial court granted defendants' motion for partial summary judgment on Lee's outrageous conduct claim. This appeal followed.

## II. Standard of Review

We review de novo a trial court's summary judgment. *West Elk Ranch, L.L.C. v. United States,* 65 P.3d 479 (Colo.2002); *Wilson v. Prentiss,* 140 P.3d 288, 290 (Colo.App.2006).

Summary judgment is appropriate when the pleadings demonstrate there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Pierson v. Black Canyon Aggregates, Inc.,* 48 P.3d 1215, 1218 (Colo. 2002). A court must examine the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, in determining whether to grant a motion for summary judgment. C.R.C.P. 56(c); *Bebo Constr. Co. v. Mattox & O'Brien,* 990 P.2d 78, 83 (Colo.1999). In determining the existence of an issue of material fact, a court must view the evidence in the light most favorable to the nonmoving party. *Gordon v. Boyles,* 99 P.3d 75, 78 (Colo.App.2004).

A material fact is one that will affect the outcome of the case. *Struble v. Am. Family Ins. Co.,* 172 P.3d 950, 954–55 (Colo.App. 2007). When the pleadings and affidavits show material facts are in dispute, it is error to grant summary judgment. *Id.* The moving party must show there is no genuine issue of material fact. Once that burden is met, the burden shifts to the nonmoving party to establish a genuine issue of material fact. *Luttgen v. Fischer,* 107 P.3d 1152 (Colo.App.2005).

The opposing party cannot rest on allegations in pleadings, but must set forth specific facts by affidavit or otherwise show there is a genuine issue. *People in Interest of A.C.,* 170 P.3d 844 (Colo.App.2007); *see* C.R.C.P. 56(e).

## III. Defamation Claim

Lee contends the trial court erred when it granted partial summary judgment on her defamation claim on the ground that she failed to allege special damages. We agree.

■ The elements for a cause of action for defamation are (1) a defamatory statement concerning another; (2) published to a third party; (3) with fault amounting to at least negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special damages or the existence of special damages to the plaintiff caused by publication. *McIntyre v. Jones,* 194 P.3d 519, 523–24 (Colo.App.2008); *see Williams v. Dist. Court,* 866 P.2d 908, 911 n. 4 (Colo. 1993).

## A. Standard of Review Applied

Lee contends the trial court applied an incorrect standard of review in granting summary judgment on the defamation claim. We agree because the trial court treated all defendants' factual allegations as true rather than viewing the facts in the light most favorable to the nonmoving party, Lee.

■ The trial court concluded defendants' first motion for summary judgment raised "a matter of law which may be addressed while treating all of Defendants' factual allegations as true." Although possibly unintended, this was error.

## B. Libel Per Se or Libel Per Quod Analysis

Lee contends the trial court also erred in concluding defendants' statements were defamatory per quod and granting summary judgment because Lee failed to allege special damages. We agree because the alleged libelous statements are defamatory per se and do not require Lee to plead special damages.

■ Libelous statements can be either defamatory per se or defamatory per quod. If a libelous statement is defamatory per se, damage is presumed and a plaintiff need not plead special damages. *Gordon,* 99 P.3d 75. If a statement is defamatory per quod, special damages must be alleged to sustain the claim. *Id.*

■ Statements are libelous per se if (1) the defamatory meaning is apparent from the face of the publication without the aid of extrinsic proof; and (2) the statement is specifically directed at a particular person. *Lin-*

*inger v. Knight,* 123 Colo. 213, 221, 226 P.2d 809, 813 (1951).

Defendants do not dispute that there was defamatory meaning apparent from the face of the Colorado Times column, and so we will not address this issue.

Rather, Lee contends the trial court incorrectly relied on *Lind v. O'Reilly,* 636 P.2d 1319 (Colo.App.1981), to find defendants' statements libelous per quod. We agree that the trial court should have followed *Gordon* and applied a libel per se analysis to the Colorado Times column.

■ In addition to having defamatory meaning, a statement must be specifically directed at the plaintiff to constitute defamation per se. *Gordon,* 99 P.3d at 78–79. A division of this court, disagreeing with *Lind,* held in *Gordon* that "determination of the identity of the defamed is separate and distinct from the determination of the defamatory character of the statement," and extrinsic evidence may be used to determine identity. *Id.* at 80. The *Gordon* division also noted that "[i]f extrinsic proof is required to establish that a communication not specifically referring to the plaintiff was reasonably understood by recipients to refer to him, such evidence will be received by the court; it has no effect on whether special damages need be proved." *Id.* (quoting Robert D. Sack, *Libel, Slander, and Related Problems* 101 (1st ed.1980)).

■ Thus, the *Gordon* division's conclusion that extrinsic evidence may be admitted to identify the plaintiff when the alleged libelous statement is defamatory per se conflicts with the holding in *Lind.* There, a division of this court concluded that a defamatory statement cannot constitute libel per se if extrinsic evidence is required to show the statement concerns the plaintiff. 636 P.2d at 1321. Defendants rely on *Lind* to support their argument that if extrinsic evidence is used to prove plaintiff's identity, the libel is necessarily per quod. Lee relies on *Gordon* to support her argument that extrinsic evidence can be used to prove identity when the alleged defamatory statement is otherwise libelous per se. We agree with the holding and reasoning in *Gordon.*

In *Gordon,* publications about a police officer did not mention the officer by name but referred to "the son of a high-ranking Denver policewoman." 99 P.3d at 81. In radio broadcasts, a talk show host said the police officer stabbed another officer in a fight, had a history of domestic violence, and had engaged in an extramarital affair. *Id.* at 78. Gordon stated in a deposition that people would infer the statements referred to him because many people knew his family. Gordon also submitted his partner's affidavit that said he understood the statements referred to Gordon. *Id.* at 81. The Gordon division held this extrinsic evidence sufficiently presented a question of fact regarding whether the statements concerned Gordon. *Id.* at 80.

The *Gordon* division relied on *Denver Publishing Co. v. Bueno,* 54 P.3d 893, 896 n. 3 (Colo.2002), where the supreme court said "libel per se does not include a requirement that the publication be specifically directed at the plaintiff." The *Gordon* division explained:

> [W]e construe this footnote to be a reaffirmation of *Lininger,* that is, the determination of the identity of the defamed is separate and distinct from the determination of the defamatory character of the statement. While it still must be established that the publication concerned the plaintiff, this determination is not part of an analysis of per se defamatory meaning.

99 P.3d at 80.

We choose to follow the reasoning and holding in *Gordon* that extrinsic evidence may be used to prove a publication refers to the plaintiff without rendering the statement defamatory per quod.

■ Here, the Colorado Times column did not mention Lee by name but referred to the widow of a Korean man shot in his liquor store a few years previously. The column stated the murder and subsequent trials attracted a lot of attention in the local Korean community. In addition to the statements in the column, defendants' motion for partial summary judgment was accompanied by Lee's responses to interrogatories, including one response detailing why Lee knew other people believed the column referred to her:

> There was so much gossip in the Korean community. It is not a large community, and so everybody seems to know everything that is going on. *When I went to church or the store or other places where Korean people were, I could see them pointing at me and talking.* I could not always hear what they were saying, but when I did hear *they were saying things like "how could she be so stupid," and repeating the things said about me in the Colorado Times like it must be true or a newspaper would not write such things.* If you understand the Korean culture, you can understand the great embarrassment and humiliation this caused me. I also had some friends tell me what other people were saying, so I know it was among more people than just the ones I saw and heard.

(Emphasis added.)

We conclude defendants did not meet their burden to show there was no genuine issue of material fact because Lee's answer to interrogatories stated that both she and others in the Korean community reasonably believed the column referred to her. Therefore, there is sufficient evidence in the record to present a genuine issue of material fact regarding whether the Colorado Times column referred to Lee.

### C. Public Concern

Lee also contends the trial court erred in concluding the column involved a matter of public concern, which triggers heightened constitutional protections. We decline to address this issue because the trial court did not do so.

■ The tort of defamation requires a plaintiff to prove the defendant's publication of a defamatory statement by a preponderance of the evidence, but if a statement involves a matter of public concern the plaintiff's evidence must be clear and convincing. *Smiley's Too, Inc. v. Denver Post Corp.,* 935 P.2d 39, 41 (Colo.App.1996).

Because the trial court did not address the issue of public concern, it would be premature for us to address it here. In any event, the issue goes to the burden of proof a

plaintiff must meet in order to prevail and has no bearing on whether summary judgment is appropriate. *See Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 775, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986).

## IV. Outrageous Conduct Claim

Lee contends the trial court erred by granting partial summary judgment on her outrageous conduct claim. We agree.

■ To state a claim for emotional distress by outrageous conduct, a plaintiff must allege behavior by a defendant that is extremely egregious. *Coors Brewing Co. v. Floyd,* 978 P.2d 663, 665 (Colo.1999). Colorado has adopted the Restatement (Second) of Torts definition of intentional infliction of emotional distress: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." Restatement (Second) of Torts § 46(1) (1965).

The supreme court has said, "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Rugg v. McCarty,* 173 Colo. 170, 177, 476 P.2d 753, 756 (1970) (quoting Restatement § 46 cmt. d).

■ Although the jury ultimately determines whether conduct is outrageous, a court must first determine if reasonable persons could differ on the question. *Culpepper v. Pearl St. Bldg., Inc.,* 877 P.2d 877, 883 (Colo.1994). In determining whether a plaintiff has alleged behavior that is outrageous as a matter of law, the trial court must analyze the totality of the defendant's conduct. *Green v. Qwest Servs. Corp.,* 155 P.3d 383, 385 (Colo.App.2006). Generally, liability for outrageous conduct exists when "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Churchey v. Adolph Coors*

*Co.,* 759 P.2d 1336, 1350 (Colo.1988) (quoting *Rugg,* 173 Colo. at 177, 476 P.2d at 756).

Colorado courts have found the facts alleged sufficient to sustain a claim for outrageous conduct in a variety of situations. *See Rugg,* 173 Colo. 170, 476 P.2d 753 (creditor's repeated request for payment and threat to garnish wages without judgment against debtor could be outrageous); *Pearson v. Kancilia,* 70 P.3d 594 (Colo.App.2003) (evidence that chiropractor had forced an employee and a patient to have sex with him was sufficient to sustain jury's finding that chiropractor had engaged in outrageous conduct); *Roget v. Grand Pontiac, Inc.,* 5 P.3d 341 (Colo.App.1999) (reasonable persons could find strong-arming during negotiations, committing fraudulent acts, and falsifying documents outrageous conduct during lease transaction); *Montgomery Ward & Co. v. Andrews,* 736 P.2d 40 (Colo.App.1987) (seizure of property from business was conducted in manner that could be found outrageous); *Danyew v. Phelps,* 676 P.2d 707 (Colo.App.1983) (wrongful eviction of tenant without notice while tenant was hospitalized supported a claim for outrageous conduct); *Meiter v. Cavanaugh,* 40 Colo.App. 454, 456, 580 P.2d 399, 400 (1978) (allegations of tenant's general belligerence, comment that plaintiff was "a sick old woman," and suggestion that status as an attorney would give him special influence in a judicial proceeding survived initial threshold for an outrageous conduct claim); *see also Donaldson v. Am. Banco Corp.,* 945 F.Supp. 1456 (D.Colo.1996) (supervisor's derogatory comments to pregnant employees were sufficient to support a claim for outrageous conduct under Colorado law); *Mass v. Martin Marietta Corp.,* 805 F.Supp. 1530 (D.Colo.1992) (applying Colorado law, court held racial slurs directed at plaintiff in an employment setting supported an outrageous conduct claim).

■ Here, under the headline "The Grief of Loss of Husband, the Joy of Loss of Husband," the Colorado Times column told a story about a Korean general's wife who sacrificed her own life to kill her husband's enemy after his death. The column described the general's wife as "truthful and respectful." Next, the column discussed the

murder of Lee's husband and the two murder suspects' subsequent trials. The column said one of the suspects was found innocent at his second trial and "it was unbelievable that he got free because of absence of the victim's wife at trial." Then the column stated,

It is just very difficult to accept the victim's wife's negligence that led the killer of her husband to be freed. We can not expect all wives to be YulYeo (truthful or respectful) but the victim's wife must have thrown away her anger that could make snow in summer when she came here across the Pacific Ocean.

This newspaper was widely distributed to the local Korean community and Lee alleged that, as a result, her reputation within the Korean community was damaged and she suffered severe emotional distress. When Lee complained to the newspaper, defendants published a retraction that implied, but did not directly acknowledge, that Lee had testified at the trial in question. Defendants admitted the column was based on a rumor from "one local Korean" and they had falsely attributed the information to another newspaper without verifying whether the other newspaper had published such information. Also, the first column was written a year after the trial at issue took place, and the record does not show defendants were under pressure to quickly publish the information without taking steps to verify their statements.

Under these circumstances, we conclude that reasonable jurors could view the first column as outrageous, going beyond all possible bounds of decency, atrocious, and utterly intolerable because it stated that Lee, a crime victim, was disloyal to her late husband, whose murder she had witnessed. The conduct could be viewed as particularly repugnant because it impugned Lee's integrity and defendants published it recklessly, without verifying the information they were given, which could have been easily checked. Because it was foreseeable that the information would likely cause Lee distress, defendants' lack of verification of the information in the first column could be viewed by a juror as repugnant. Finally, defendants admitted

in their retraction that the column had caused Lee "emotional pain."

An average member of the community, upon hearing the facts alleged, could view defendants' conduct as atrocious and utterly intolerable in a civilized community. We are persuaded that this case is similar to others where Colorado courts have found the facts alleged sufficient to support a claim of outrageous conduct.

Additionally, the conduct here is more egregious than that in *Gordon*, where the court affirmed the dismissal of an outrageous conduct claim. There, the plaintiff police officer based his outrageous conduct claim on false allegations of stabbing another police officer, a history of domestic violence, and engaging in an extramarital affair. Even if the stabbing allegation was false, it was predicated on the good faith belief of the defendant radio talk show host that it was true, based on his reliable sources. Here, in contrast, defendants admitted in their retraction column that they had printed false information based on an *unreliable* source.

Further, the *Gordon* division found that the domestic violence allegations were true; therefore, they could not support an outrageous conduct claim. Finally, the extramarital affair allegation, even if true, could not constitute outrageous conduct given the frequent media reports of similar conduct.

Defendants cite *Coors Brewing Co. v. Floyd*, 978 P.2d 663, and *Culpepper v. Pearl Street Building*, 877 P.2d 877, to support their argument that the facts alleged here are not outrageous as a matter of law. We conclude these cases are distinguishable.

In *Coors Brewing Co.*, a Coors investigator alleged the company asked him to secretly investigate other employees for drug violations. Against the advice of its own lawyers, Coors continued the investigations and concealed its involvement by laundering the funds used. The employee alleged Coors directed him to hide evidence and later fired him to cover up its involvement and place the blame on the employee. 978 P.2d at 664–65. However, the court analyzed only the company's alleged scapegoat firing of the employee and did not consider the fraud or illegal

investigations in which the company allegedly had engaged because that conduct was not specifically directed at the employee. *Id.* at 666. The court held that the conduct alleged was not sufficiently outrageous as a matter of law. *Id.*

*Coors Brewing Co.* is distinguishable from the case at hand because the illegal investigations and fraud alleged there were not part of the conduct directed at the employee and therefore were not considered by the court in analyzing the totality of the company's conduct. Here, all of defendants' conduct in question relates to Lee. Therefore, the column and the circumstances surrounding its publication may be evaluated to determine whether reasonable people could find defendants' conduct outrageous.

In *Culpepper*, the supreme court held that a mistaken cremation of a body was not intentional or reckless and therefore did not support a claim for outrageous conduct where the wrong body had been delivered. 877 P.2d at 883. Contrary to defendants' assertions, the facts alleged here do not indicate that they simply made a mistake when they wrote that Lee's failure to testify resulted in the release of a suspect in her husband's murder. Instead, defendants admit they based their information on rumor within the Korean community and falsely attributed that information to another newspaper without verifying whether the other newspaper had published such information. Accordingly, we conclude defendants' conduct is not analogous to the mistake that occurred in *Culpepper*.

Even if we were to consider defendants' retraction as part of the totality of the circumstances, we would still conclude that the circumstances here were sufficient to present a jury question as to whether their conduct was outrageous. While the retraction acknowledged they had acted wrongly, they also acknowledged that they had not verified their allegations, had provided "bogus information," and had caused Lee emotional pain. Thus, the retraction could be viewed as confirming the outrageousness of defendants' actions.

After evaluating the totality of defendants' alleged conduct, we further conclude that reasonable people could differ on whether that conduct was outrageous and therefore the trial court erred in granting partial summary judgment.

## V. Effect of Retraction on Damages

Defendants contend the retraction is relevant to the question of outrageous conduct and should nullify or reduce their liability. We agree that a retraction may reduce a defendant's liability for damages in an outrageous conduct claim, but the retraction does not provide an alternative basis for affirming the trial court's summary judgment.

Colorado has no published appellate decisions regarding whether retractions may negate or reduce liability for outrageous conduct. Thus, we look to other jurisdictions for guidance. We have found no cases addressing the effect of a retraction on a claim for outrageous conduct.

However, in the area of defamation, many courts have held that retractions may be used to mitigate damages. *See, e.g., Storey v. Wallace*, 60 Ill. 51 (1871) (a retraction does not release a claim for damages because "a retraction in any case is but poor atonement" where newspaper falsely accused woman of having a child with another man while her husband was overseas in the military); *Koontz v. Weide*, 111 Kan. 709, 208 P. 651 (1922) (a retraction does not bar the recovery of damages but may mitigate damages or tend to show an absence of malice); *Whitcomb v. Hearst Corp.*, 329 Mass. 193, 107 N.E.2d 295, 300 (1952) (a retraction is an affirmative defense to damages "with the burden of proof upon the defendants to convince the jury of the extent to which the damages had been mitigated"); *Davis v. Marxhausen*, 103 Mich. 315, 61 N.W. 504 (1894) (a retraction is admissible to mitigate damages but may not be used to explain the circumstances under which the original publication was made); *Dixie Fire Ins. Co. v. Betty*, 101 Miss. 880, 58 So. 705 (1912) (a retraction cannot bar a defamation claim but may be considered by a jury in mitigating damages); *DiLorenzo v. N.Y. News, Inc.*, 81 A.D.2d 844, 432 N.Y.S.2d 483, 487 (N.Y.App. Div.1980) (holding a retraction can be used to

mitigate damages). *But see Linney v. Maton*, 13 Tex. 449 (1855) (if slanderous words are immediately retracted in the same conversation and in the presence of all the people who heard them, to show the speaker meant no imputation, no action may be maintained).

In *Francis v. Lake Charles American Press*, the Louisiana Court of Appeals explained why retractions are appropriate to mitigate damages:

> There is no doubt that a retraction may be considered in the mitigation of the damages, but it is not the rule that a retraction may relieve a person from the responsibilities of the wrong and the damages he has caused, the reason being as correctly stated in *Perret v. New Orleans Times*, [25 La. Ann. 170 (1873)], "Neither does the law regard the injury inflicted as being repaired by a subsequent retraction or apology by the publisher, however promptly it may be made for it is quite reasonable to infer that many may have read the libel who never saw or heard of its disavowal." From this it is evident that it is the effects of the retraction which must be considered, as a different rule would permit the use of the retraction to absolve the defendant of all damages by merely publishing a retraction.

241 So.2d 73, 76 (La.Ct.App.1971) (citing *Tresca v. Maddox*, 11 La. Ann. 206 (1856)), *aff'd*, 262 La. 875, 265 So.2d 206 (1972); *see also Perret*, 25 La. Ann. 170 (a retraction cannot exonerate a defendant entirely because the injury caused by one publication cannot be "wholly obliterated by the recantation in another," but it can be considered by a jury in calculating damages).

■ The vast majority of cases agree that retractions may be used to mitigate damages in a defamation case but do not absolve a defendant of liability. We find these cases a helpful analogy and choose to apply their reasoning to outrageous conduct claims. We agree with the reasoning of other courts that a retraction cannot entirely erase the injury sustained by a plaintiff but a defendant may use the retraction as evidence that the harm was limited and damages should be reduced.

Accordingly, we hold that defendants' retraction may not be considered when evaluating the totality of their conduct. However, if the alleged conduct is found to be outrageous, the retraction may be considered when calculating damages. In determining the extent to which damages were mitigated, a jury may consider whether the retraction was full and complete, the timing and placement of the retraction, whether defendants admitted a mistake, whether defendants apologized, the audience the retraction reached, and the effect the retraction had on lessening the harm caused to Lee. We note that defendants' retraction column did not explicitly retract the statement in the first column that Lee did not testify at Barnes' second trial. Therefore, a jury may find that the retraction was not full and complete.

The partial summary judgments are reversed, and the case is remanded for further proceedings consistent with this opinion.

Judge BOORAS concurs.

Judge DAILEY concurs in part and dissents in part.

Judge DAILEY concurring in part and dissenting in part.

I concur in that part of the majority's decision reversing the trial court's summary judgment on Lee's defamation claim.

I dissent, however, from that part of the majority's decision holding that the trial court also erred in dismissing Lee's outrageous conduct claim. As more fully explained below, unlike the majority, I would (1) consider the timing and content of defendants' retraction in determining whether their conduct was outrageous, and (2) under the totality of the circumstances, conclude that defendants' conduct was not sufficiently outrageous to support a claim for outrageous conduct.

The elements of the tort of intentional infliction of emotional distress, otherwise known as "outrageous conduct," are (1) the defendant engaged in extreme and outrageous conduct; (2) recklessly or with the intent of causing the plaintiff severe emotional distress; (3) causing the plaintiff to suffer

severe emotional distress. *Pearson v. Kancilia*, 70 P.3d 594, 597 (Colo.App.2003).

The only element at issue here is the first. More specifically, the issues in this case concern which circumstances may be considered in analyzing that element and whether the proffered evidence in this case is sufficient to support a finding of the existence of that element.

Turning to the first issue, our case law recognizes that, in determining whether a defendant's conduct qualifies as extreme and outrageous, the totality of the defendant's conduct must be evaluated. *Green v. Qwest Services Corp.*, 155 P.3d 383, 385 (Colo.App. 2006); *see also Zalnis v. Thoroughbred Datsun Car Co.*, 645 P.2d 292, 294 (Colo.App. 1982) ("it is the totality of conduct that must be evaluated to determine whether outrageous conduct has occurred"); *Harrison v. Luse*, 760 F.Supp. 1394, 1401 (D.Colo.) ("it is the totality of the circumstances that must be evaluated to determine whether outrageous conduct has occurred"), *aff'd*, 951 F.2d 1259 (10th Cir.1991) (unpublished table decision).

If, in assessing this element, the totality of the defendants' conduct must be considered, I am at a loss to understand why a particular type of conduct—namely, a retraction or repudiation of earlier offensive conduct—would not be taken into consideration. Indeed, in one of our reported cases, a retraction of a sort was considered in assessing the outrageousness of the defendant's actions.

In *Bob Blake Builders, Inc. v. Gramling*, 18 P.3d 859, 866–67 (Colo.App.2001), an officer of a construction company threatened to "rip the [homeowners'] house down" if they did not pay an outstanding bill. The division held:

> [The] evidence, viewed in the light most favorable to [the homeowners], shows merely that the officer threatened them in contemplation of litigation. The threat was momentary in nature and was soon retracted. Hence, it cannot be considered as so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency.

*Id.* at 867.

Consistent with the totality of circumstances test, and with the rationale of *Bob Blake Builders, Inc.*, I would hold that defendants' retraction and apology, made two weeks after the incident of offensive conduct, should be taken into account in determining whether their overall conduct was sufficiently outrageous to meet the threshold requirement for a claim of outrageous conduct.

I would also hold that, under the totality of the circumstances, the proffered evidence of defendants' conduct was insufficient to support a claim for outrageous conduct.

"The tort of outrageous conduct was designed to create liability for a very narrow type of conduct." *Green*, 155 P.3d at 385. Consequently,

> the level of outrageousness required to create liability is extremely high. Mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities are insufficient. Only conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and be regarded as atrocious and utterly intolerable in a civilized community, will suffice.

*Pearson*, 70 P.3d at 597; *see Churchey v. Adolph Coors Co.*, 759 P.2d 1336, 1350 (Colo. 1988) (facts must so arouse resentment against the defendant in average members of the community as to lead them to exclaim, "Outrageous!"); *Sawabini v. Desenberg*, 143 Mich.App. 373, 383, 372 N.W.2d 559, 565 (1985) (facts must so arouse resentment against the defendant in an average member of the community as to "lead him to *scream*, 'Outrageous!' ") (emphasis added); *Bennett v. Jones, Waldo, Holbrook & McDonough*, 70 P.3d 17, 32 (Utah 2003) ("To be considered outrageous, 'the conduct must evoke outrage or revulsion; it must be more than unreasonable, unkind, or unfair.' " (quoting *Franco v. Church of Jesus Christ of Latter-day Saints*, 21 P.3d 198, 207 (Utah 2001) (quoting 86 C.J.S. *Torts* § 70, at 722))).

The rationale behind limiting the type of actionable conduct for this tort is that "[p]ersons must necessarily be hardened to a certain amount of rough language and to occasional acts that are definitely inconsiderate

and unkind." *Bob Blake Builders, Inc.*, 18 P.3d at 866.

An outrageous conduct claim may be submitted to the jury only if reasonable persons could differ on whether the defendant's conduct was sufficiently outrageous. *Coors Brewing Co. v. Floyd*, 978 P.2d 663, 665 (Colo.1999). Whether reasonable persons could differ on the outrageousness issue is a question of law subject to de novo review by this court. *Pearson*, 70 P.3d at 597.

Courts are generally unlikely to find that a single instance of offensive behavior constitutes outrageous conduct. "A single act may be regarded as outrageous if it is so extreme in degree that it would be considered intolerable by an average member of the community," but "courts are more likely to find outrageous conduct in a series of incidents or a course of conduct than in a single incident." John W. Grund, K. Kent Miller & Graden P. Jackson, 7 Colo. Prac., *Personal Injury Torts and Insurance* § 23.3 (2d ed.2009) (noting, also, a case in which "a supervisor's response to a customers' question, although highly inappropriate, was the type of single insult or unkind act that is normally not considered sufficient to constitute outrageous conduct").

In the present case, we have but one offensive act, that is, defendants' publication of an article in a newspaper. In that article, defendants criticized Lee (without specifically naming her) for not testifying at the trial of the accomplice of her husband's murderer. The article purported to be based on facts previously reported by another newspaper. However, the article's basic premises—that another newspaper had published these facts, and that Lee had not testified and was responsible for the acquittal of the accomplice in her husband's murder—were demonstrably false.

Two weeks later, defendants published a second article in which they admitted that the contents of the earlier article were not true. In that article, they recounted how, upon Lee's complaint, they went back and checked their story and determined that, as Lee insisted, it was not true. They admitted that, although their earlier article appeared to quote another newspaper, it was in reality based solely "on a rumor [they] heard from one local Korean saying that he saw the [other paper's] article," and that they had failed to check the validity of the rumor. Defendants publicly apologized in the article for the emotional pain they had inflicted on Lee.[1]

Although defendants' first article was defamatory, defamation does not, in and of itself, constitute extreme and outrageous conduct. *See Gordon v. Boyles*, 99 P.3d 75, 82 (Colo.App.2004); *see also Holtzscheiter v. Thomson Newspapers, Inc.*, 306 S.C. 297, 411 S.E.2d 664 (1991) (libel fell short of the standard required for extreme and outrageous conduct), *overruled on other grounds in later appeal, Holtzscheiter v. Thomson Newspapers, Inc.*, 332 S.C. 502, 506 S.E.2d 497 (1998); *Zoumadakis v. Uintah Basin Med. Ctr., Inc.*, 122 P.3d 891, 894 (Utah Ct.App. 2005) ("Even if the statements made about her were false, derogatory statements alone do not give rise to a claim of intentional infliction of emotional distress.").

Nor does the spreading of rumors or the making of false accusations qualify, without more, as extreme and outrageous conduct. *See, e.g., Bodett v. CoxCom, Inc.*, 366 F.3d 736, 747–48 (9th Cir.2004) ("Arizona courts have typically found false accusations alone not enough to constitute an intentional infliction of emotional distress."); *Peterson v. Eder*, 2001 WL 1868822, *2–3 (Mass.Super.Ct. No. BACV20000759, Dec. 27, 2001) ("Gossiping and spreading stories are petty human commonplaces neither so outrageous in character nor so extreme in degree 'as to go beyond all possible bounds of decency, to be regarded as atrocious and utterly intoler-

---

1. In this regard, defendants wrote:
   We apologize to [Lee] . . . and we would like to correct the wrong information. . . .
   [A]ll of us at our newspaper apologize to [Lee] and the family for using wrong quotes to inflict their emotional pain.
   . . . .

[W]e made another mistake in comparing [another woman's] fidelity to [Lee's] unconcern based on [her] improper conduct. Again, we apologize to [Lee] and the family for causing emotional pain by writing the bogus information.

able in a civilized community.'") (quoting *Foley v. Polaroid Corp.*, 400 Mass. 82, 508 N.E.2d 72, 82 (1987)), *aff'd on other grounds*, 860 N.E.2d 49 (Mass.App.Ct.2006).

Instead, it is the nature of the defamation, the rumor, or the false accusation, that *could* make the conduct actionable as outrageous conduct. *Compare Carraway v. Cracker Barrel Old Country Store, Inc.*, No. 02–2237, 2003 WL 21685909, at *14 (D.Kan. July 16, 2003) (deciding that spreading of false rumors to former coworkers and customers that "plaintiff stole money, used drugs, had a drinking and/or gambling problem and was [a] lesbian" was not "extreme and outrageous" conduct establishing intentional infliction of emotional distress); *Batson v. Shiflett*, 325 Md. 684, 602 A.2d 1191 (1992) (even though accusations of conspiracy, perjury, and falsification of records in labor dispute were defamatory, they did not satisfy exacting standard for extreme and outrageous conduct); and *Hanssen v. Our Redeemer Lutheran Church*, 938 S.W.2d 85 (Tex.App. 1996) (accusing employee of misappropriating church funds was not deemed extreme and outrageous conduct), *with Ogle v. Hocker*, 279 Fed.Appx. 391, 400 (6th Cir.2008) (bishop's alleged conduct of deliberately spreading false rumors of another bishop's homosexual inclinations on multiple occasions to large audiences may amount to "extreme and outrageous conduct" under Michigan law); *McConnell v. State Farm Mut. Ins. Co.*, 61 F.Supp.2d 356, 363 (D.N.J.1999) (listing, as an example of actionable outrageous conduct, "spreading a false rumor that plaintiff's son had hung himself").

In *Gordon v. Boyles*, 99 P.3d at 79, 82, a division of this court held that a radio talk show host's defamatory statements, made in several separate broadcasts, accusing a police officer of a criminal offense (stabbing another police officer) and of serious sexual misconduct (engaging in an extramarital affair) were not actionable as outrageous conduct.

In my view, defendants' actions in this case are less egregious than those in *Gordon*. Inasmuch as they accused Lee of dishonoring her husband by being unconcerned with or indifferent to the fate of a person involved in his murder, defendants' actions were definitely insensitive, inconsiderate, unkind, and irresponsible. But, particularly when viewed in light of defendants' subsequent retraction of, and apology for, the story, I cannot think that a reasonable person could find that the totality of defendants' conduct was so outrageous, so vile, so reprehensible, as to go beyond all possible bounds of decency and be regarded as atrocious and utterly intolerable in a civilized community. *See, e.g., White v. Manchester Enter., Inc.*, 871 F.Supp. 934, 939–40 (E.D.Ky.1994) ("[V]iewing the evidence in the light most favorable to Ms. White, defendants, at most, acted recklessly in publishing false statements that were embarrassing to Ms. White and damaging to her reputation with minimal effort to substantiate their statements. While defendants' alleged actions are not something to be encouraged, their actions do not constitute extreme and outrageous behavior that must be regarded as atrocious and utterly intolerable in the community."); *Holtzscheiter*, 411 S.E.2d at 665, 667 (although by reporting that "there simply [had been] no family support to encourage [the 17–year–old murder victim] to continue her education," newspaper may have implied that victim had an unfit mother who contributed to her death, "the language of the article here was not so extreme and outrageous as to exceed all possible bounds of decency").

In reaching my conclusion, I have considered the cases cited by the majority in support of their decision. I find those cases distinguishable on two grounds, namely, the nature and repetitiveness of the conduct involved.

The authorities have identified some categories of conduct that typically qualify as extreme and outrageous conduct.

For instance, extreme and outrageous conduct "may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests . . . . In particular police officers, school authorities, landlords, and collecting creditors have been held liable for extreme abuse of their position." Restatement (Second) of Torts § 46 cmt. e. (1965); *see also, e.g., Todd v. South Carolina Farm Bureau Mut. Ins.*

**970**

*Co.,* 283 S.C. 155, 321 S.E.2d 602, 610–11 (Ct.App.1984) (extreme and outrageous conduct has often been found in cases where "a pre-existing legal relationship between the parties has existed, typically a debtor-creditor, insured-insurer, landlord-tenant, physician-patient or employer-employee relationship"), *quashed in part on other grounds,* 287 S.C. 190, 336 S.E.2d 472 (1985).

Extreme and outrageous conduct may also "arise from the actor's knowledge that the other is peculiarly susceptible to emotional stress, by reason of some physical or mental condition or peculiarity. The conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge, where it would not be so if he did not know." Restatement (Second) of Torts § 46 cmt. f; *see also, e.g., Todd,* 321 S.E.2d at 611 (extreme and outrageous conduct occurs where "the defendant calculatedly inflicted suffering or heedlessly and contemptuously disregarded the plaintiff's present emotional suffering").

The cases cited by the majority fit into these categories; each involved an abuse of a pre-existing legal relationship between the parties. *Pearson, Meiter,* and *Mass* each involved an employer-employee relationship; *Rugg* involved a debtor-creditor relationship; *Danyew* involved a landlord-tenant relationship; *Montgomery Ward & Co.* involved a principal-agent relationship; and *Roget* involved a lessor-lessee relationship.

Moreover, all but two of the cases relied upon by the majority involved conduct of an ongoing nature, including actions taken on multiple occasions. Only two of those cases, *Montgomery Ward & Co.* and *Danyew,* involved a single incident, and, as mentioned above, those two cases involved an abuse of a pre-existing legal relationship.

Here, defendants' actions did not fall within typical categories of extreme and outrageous conduct. There was no pre-existing legal relationship between defendants and Lee; nor was there any evidence that defendants knew that Lee was peculiarly susceptible to emotional stress, by reason of some physical or mental condition or peculiarity.

Moreover, defendants acted in an offensive manner on but one occasion. Two weeks later, they apologized for their earlier act. In my view, the facts of this case are readily distinguishable from those in the cases upon which the majority relies.

For these reasons, I would hold that the trial court properly granted summary judgment dismissing Lee's outrageous conduct claim against defendants.